FILED

2026 May-28 PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL CRAIG MAXWELL,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:   3:10-cv-02066-MHH** |
| | ) | |
| **TERRY RAYBON, Warden of** | ) | |
| **William C. Holman Correctional** | ) | |
| **Facility,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>CORRECTED MEMORANDUM OPINION\*</u>

Michael Craig Maxwell has petitioned the Court for a writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. 8).  Mr. Maxwell challenges his state court conviction for capital murder.  To resolve the petition, the Court first provides the procedural and factual background for Mr. Maxwell's convictions and sentence. The Court then discusses habeas principles germane to this case.  Finally, the Court applies these habeas principles to the procedural and factual record to decide this matter.

---

*After entering the opinion in this case, (Doc. 57), the Court noticed that it mistakenly referred to Mr. Maxwell's *pro se* Rule 32 petition several times as a Rule 32 motion. The Court enters this corrected opinion to address the mistaken references on pp. 17, 22, 86, 88, 89, 93, 94, 95, 121, and 150 in Doc. 57 and to insert the word "school" mistakenly omitted from p. 116.  The revisions on pp. 17, 18, 22, 86, 88, 89, 93, 95, 96, 116, 121, and 150 of this corrected opinion are highlighted for ease of reference.

## I.

A grand jury in Colbert County, Alabama indicted Mr. Maxwell on four capital counts. (Doc. 40, pp. 170–71). In Counts 1 and 2, the State charged Mr. Maxwell with shooting Harold Pugh and his son, Joey Pugh, with a handgun during a first-degree robbery. (Doc. 40, p. 170); Ala. Code § 13A-5-40(a)(2). In Count 3, the State charged Mr. Maxwell with murdering Mr. Pugh and Joey in one act, scheme, or course of conduct. (Doc. 40, p. 171); Ala. Code § 13A-5-40(a)(10). In Count 4, the State charged Mr. Maxwell with murdering a child, Joey Pugh. (Doc. 40, p. 171); Ala. Code § 13A-5-40(a)(15).

Attorneys Benjamin T. Gardner and Robert C. Graham defended Mr. Maxwell on these charges in the trial court. (Doc. 40, p. 5). Mr. Maxwell moved for a change of venue. (Doc. 40, p. 101; Doc. 40-8, p. 63). The state court held a hearing on Mr. Maxwell's motion, granted the motion, and transferred the case from the Circuit Court of Colbert County, Alabama to the Circuit Court of Jefferson County, Alabama. (Doc. 40, pp. 58, 99, 101; Doc. 40-8, pp. 63–93). The state circuit judge presiding over Mr. Maxwell's capital case did not change. (Doc. 40, pp. 58–60). The state circuit judge obtained approval from the Alabama Supreme

Court to conduct the trial in Jefferson County "with . . . full authority . . . and . . . until final disposition."   (Doc. 40, p. 58).

The Alabama Court of Criminal Appeals described the evidence from Mr. Maxwell's trial in *Maxwell v. State*, 828 So. 2d 347 (Ala. Crim. App. 2000), the Court of Criminal Appeals' opinion regarding Mr. Maxwell's direct appeal. [1] Consistent with the principles discussed below, these facts are presumptively correct.   28 U.S.C. § 2254(e)(1).   In his habeas petition, Mr. Maxwell does not challenge the state appellate court's description of the trial evidence.

The evidence reflects that the Colbert County Sheriff's Department received a report that Mr. Pugh and his eleven-year-old son, Joey, were missing.   *Maxwell Direct*, 828 So. 2d at 351.   Mike Sennet, "a friend of the Pughs," testified that, after learning about the missing-persons report, "he and several friends went looking for [Mr. Pugh and Joey] at Cane Creek, in Colbert County" because Mr. Pugh and his son "were avid fishermen and . . . fished frequently on Cane Creek and its surrounding areas."   *Maxwell Direct*, 828 So. 2d at 351.   Local authorities and a rescue squad joined the search at Cane Creek.   *Maxwell Direct*, 828 So. 2d at 351. During the search, Mr. Sennett spotted Mr. Pugh's and Joey's bodies in the creek.

---

[1] To distinguish this appellate decision from the state collateral appellate proceedings, the Court short-cites this decision as "*Maxwell Direct*."

*Maxwell Direct*, 828 So. 2d at 351.   Evidence from autopsy reports showed that Mr. Pugh and Joey both had been shot in the head.   *Maxwell Direct*, 828 So. 2d at 351.

An employee of the Deposit Guaranty National Bank in Belmont, Mississippi testified about a robbery that occurred "on the day the victims' bodies were found." *Maxwell Direct*, 828 So. 2d at 351.   The bank employee described the robbers as "two armed men, wearing dark-colored army fatigues, hooded shirts, sunglasses, and gloves."   *Maxwell Direct*, 828 So. 2d at 351.   Although she could not identify the men, she described the vehicle they used to flee after the robbery as "a black Z-71 four-wheel drive pickup truck with a chrome toolbox in the rear bed."   *Maxwell Direct*, 828 So. 2d at 351.

An officer of the Belmont Police Department testified that, "[s]hortly after the robbery" in Mississippi, he discovered a truck that matched the bank employee's description.   The truck was located "in a heavily wooded area" several miles from the bank.   *Maxwell Direct*, 828 So. 2d at 351.   Someone had set the truck on fire. *Maxwell Direct*, 828 So. 2d at 351.   Police searched the truck's front passenger-side floorboard and found a pedestal-type seat, "which, according to testimony, was

4

typical of the seats found in the front of bass-fishing boats." *Maxwell Direct*, 828 So. 2d at 351.

Donald Pennington, a Colbert County resident, testified that, five days after the recovery of the Pughs' bodies, he located a green and white boat in a "remote wooded area in neighboring Franklin County." *Maxwell Direct*, 828 So. 2d at 351; (Doc. 40-11, pp. 15–19). Mr. Penington recalled "hear[ing] 'reports'" that a boat with those colors "was being sought in the investigation" of the Pughs' murders. *Maxwell Direct*, 828 So. 2d at 351. Authorities searched the boat and secured several items, including rods and reels, a tacklebox, two baseball caps, and "two spent 9mm shell casings." *Maxwell Direct*, 828 So. 2d at 351–52. Trial testimony established that someone had removed the boat's pedestal-type seat. *Maxwell Direct*, 828 So. 2d at 351–52.

Mr. Maxwell became a suspect in the bank robbery and the murders. *Maxwell Direct*, 828 So. 2d at 352. Eventually, the Colbert County Sheriff's Department filed a felony complaint against Mr. Maxwell and obtained an arrest warrant from the Colbert County District Court charging Mr. Maxwell with murder. (Doc. 40, pp. 181, 185–200). Mr. Maxwell "turned himself in[to] the authorities at the sheriff's office in Russellville," in Franklin County, Alabama. (Doc. 40-8, p.

5

103).   Law enforcement transported Mr. Maxwell to the Colbert County jail. (Doc. 40-8, p. 131).   There, Mr. Maxwell signed a waiver of rights document. (Doc. 40-8, pp. 108–09, 124–29).   Mr. Maxwell agreed to give a recorded statement.   (Doc. 40-8, pp. 112–14).   He provided "a detailed statement admitting his involvement" in the murder of the Pughs and the bank robbery.   *Maxwell Direct*, 828 So. 2d at 352; (Doc. 40-8, p. 114).   Mr. Maxwell discussed in the statement how "his four codefendants—Mark Moore, Dale Ferguson, Donald Risley, and Kino Graham" participated in the crimes.   *Maxwell Direct*, 828 So. 2d at 352.[2]

After he was indicted, Mr. Maxwell moved to suppress his recorded statement.   (Doc. 40, pp. 63–64).[3]   The trial court held a suppression hearing and denied the motion.   (Doc. 40, pp. 9–10; Doc. 40-8, pp. 94–95, 99).   At trial, the State relied on Mr. Maxwell's statement to prove his participation in the robbery and murders of the Pughs.   (Doc. 40, pp. 22–40).

---

[2] During the guilt-phase of trial, the jury had the audio recording of Mr. Maxwell's recorded statement.   (Doc. 40-12, p. 128).   During the penalty phase, the jury received the transcript of the audio recording of Mr. Maxwell's statement.   (Doc. 40-13, p. 119).

[3] Mr. Maxwell moved to suppress his statements on the grounds that the statements were obtained in violation of the 4th, 5th, and 14th amendments because he made the statements without counsel, without adequate warning of his rights, and "at a time during which he was undergoing great mental strain and physical pain."   (Doc. 40, p. 63).

According to Mr. Maxwell, the five men "had conspired to rob banks to get money." *Maxwell Direct*, 828 So. 2d at 352. Mr. Maxwell identified himself as "second in command" and Mr. Moore as the group's "leader." *Maxwell Direct*, 828 So. 2d at 352. Mr. Maxwell and the others "bought clothing . . . to wear during the robberies;" that clothing "match[ed]" the employee's description of how the bank robbers in Belmont had dressed. *Maxwell Direct*, 828 So. 2d at 352. Mr. Moore "sold stock and took out a loan to buy guns, handheld radios, and other items to use in the robberies." *Maxwell Direct*, 828 So. 2d at 352.

Mr. Maxwell stated that "find[ing] two cars to use in the Belmont bank robbery" was part of the plan. *Maxwell Direct*, 828 So. 2d at 352. The group, minus Mr. Moore, went "looking for a car to steal" and "saw the Pughs' truck parked near the boat landing at Cane Creek." *Maxwell Direct*, 828 So. 2d at 352. According to Mr. Maxwell, "they waited for approximately 30 minutes for the Pughs to return." *Maxwell Direct*, 828 So. 2d at 352.

When Mr. Pugh arrived at the landing in his boat, he "got out of the boat and into his truck" and "back[ed] the truck down the landing to load the boat onto the trailer." *Maxwell Direct*, 828 So. 2d at 352. Mr. Maxwell "approached [Mr. Pugh] and ordered him and his son back into the boat at gunpoint." *Maxwell*

7

*Direct*, 828 So. 2d at 352. Mr. Maxwell was carrying a 9mm pistol, and Mr. Ferguson had a .357 revolver. *Maxwell Direct*, 828 So. 2d at 352; (*see* Doc. 40-11, p. 187; Doc. 40-12, pp. 29, 36, 38) (identifying these firearms as "a Ruger nine millimeter semiautomatic pistol" and "a Ruger .357 Magnum new model Blackhawk single action six shot revolver").

Mr. Maxwell and Mr. Ferguson "got into the boat with the Pughs" while Mr. Risley and Mr. Graham "waited onshore with the truck." *Maxwell Direct*, 828 So. 2d at 352. According to Mr. Maxwell, he and Mr. Ferguson "left in the boat with the victims, heading down creek." *Maxwell Direct*, 828 So. 2d at 352. Mr. Maxwell identified Mr. Ferguson as the first to shoot. Mr. Ferguson shot Mr. Pugh. *Maxwell Direct*, 828 So. 2d at 352. Mr. Maxwell confessed to shooting Joey Pugh. *Maxwell Direct*, 828 So. 2d at 352. Concerned that Mr. Pugh "was still alive," Mr. Maxwell shot him again, and Mr. Ferguson fired a second shot at Joey. *Maxwell Direct*, 828 So. 2d at 352. Mr. Maxwell confessed to "thr[owing] the victims' bodies from the boat into the water." *Maxwell Direct*, 828 So. 2d at 352.

Mr. Maxwell stated that he and Mr. Ferguson "returned in the boat to the landing," where Mr. Graham and Mr. Risley were waiting. *Maxwell Direct*, 828 So. 2d at 352. The men "loaded the boat onto the trailer and drove the Pughs' truck

8

and the boat to a clearing in the woods in Franklin County." *Maxwell Direct*, 828 So. 2d at 352. Before leaving the area, the men took a ".22 caliber pistol that was in the boat" and "a .38 caliber pistol . . . [that was] inside the victims' truck." *Maxwell Direct*, 828 So. 2d at 352. "[A]fraid that he had left his fingerprints on the boat seat," Mr. Ferguson removed the seat and "put it into the victims' truck." *Maxwell Direct*, 828 So. 2d at 352–53.

According to Mr. Maxwell, the men "le[ft] the boat and the truck in the clearing" and went to his apartment. *Maxwell Direct*, 828 So. 2d at 353. They called Mr. Moore and "told him to come to the apartment." *Maxwell Direct*, 828 So. 2d at 353. "[E]veryone agreed to meet back at [Mr. Maxwell's] apartment at 6:00 . . . the following morning." *Maxwell Direct*, 828 So. 2d at 353.

The group, minus Mr. Graham, who did not return, met at Mr. Maxwell's apartment in the morning and "discussed plans for the robbery of the bank in Belmont, Mississippi." *Maxwell Direct*, 828 So. 2d at 353. According to Mr. Maxwell, he and Mr. Risley "were going to be the ones to go inside the bank." *Maxwell Direct*, 828 So. 2d at 353. While the robbery was happening, Mr. Moore and Mr. Ferguson were going to be outside the bank "act[ing] as 'snipers.'" *Maxwell Direct*, 828 So. 2d at 353.

9

Mr. Maxwell and Mr. Risley rode in Mr. Maxwell's car, and Mr. Moore and Mr. Ferguson followed in Mr. Moore's truck to the clearing "where they had left the victims' truck and boat." *Maxwell Direct*, 828 So. 2d at 353. Mr. Risley "drove the victims' truck to Belmont;" Mr. Maxwell "drove his own car," and Mr. Moore and Mr. Ferguson drove in Mr. Moore's truck. *Maxwell Direct*, 828 So. 2d at 353. The group's next stop was "their 'rendezvous point' in Belmont, where they left Maxwell's car." *Maxwell Direct*, 828 So. 2d at 353.

The group proceeded to the bank with Mr. Maxwell and Mr. Risley driving the victims' truck and Mr. Moore and Mr. Ferguson following in Mr. Moore's truck. *Maxwell Direct*, 828 So. 2d at 353. Mr. Maxwell and Mr. Risley robbed the bank of "approximately $40,000." *Maxwell Direct*, 828 So. 2d at 353. After the bank robbery, Mr. Maxwell and Mr. Risley "drove the victims' truck back to the 'rendezvous point'" and met Mr. Moore and Mr. Ferguson there. *Maxwell Direct*, 828 So. 2d at 353. Mr. Maxwell and Mr. Risley "put their guns in Moore's truck[] and . . . the clothes they had worn in the robbery in the victims' truck." *Maxwell Direct*, 828 So. 2d at 353. Mr. Risley "poured gasoline on the victims' truck and set it on fire." *Maxwell Direct*, 828 So. 2d at 353. The group returned to Mr.

10

Maxwell's apartment and "divided the proceeds of the bank robbery." *Maxwell Direct*, 828 So. 2d at 353.

Mr. Maxwell mentioned in his statement that the police had come to his house "[s]ometime after the robbery and . . . murders." *Maxwell Direct*, 828 So. 2d at 353. According to Mr. Maxwell, Mr. Moore expressed concern because the police took some guns, including "the 9mm pistol that Maxwell had used to shoot the victims." *Maxwell Direct*, 828 So. 2d at 353.

Other guilt-phase evidence established that "the 9mm pistol [which] police took from Moore's house was the weapon that fired at least one of the bullets recovered from Harold Pugh's body." *Maxwell Direct*, 828 So. 2d at 353. Trial evidence linked the 9mm pistol to "the two spent shell casings found in the boat." *Maxwell Direct*, 828 So. 2d at 353.

Trial testimony indicated that Mr. Maxwell, Mr. Graham, Mr. Ferguson, and Mr. Moore knew each other because they "worked together at the Helig-Meyers Furniture Distribution Center in Russellville, in Franklin County, Alabama." *Maxwell Direct*, 828 So. 2d at 353. "[S]everal weeks before the Pughs' murders and the bank robbery," the men, "except [Mr.] Graham, quit their jobs, or failed to return to work." *Maxwell Direct*, 828 So. 2d at 353. The day after the bank

11

robbery, Mr. Maxwell bought "a used pickup truck [for $2,800], using $100 bills." *Maxwell Direct*, 828 So. 2d at 353.

On May 13, the third day of the guilt-phase of Mr. Maxwell's case, the jury found him guilty of capital murder on all charges against him.    (Doc. 40-1, pp. 32–35).    The penalty phase took place the following day.    (Doc. 40-12, pp. 131–32). The trial judge began the day by telling the jurors that she anticipated that they would begin and complete the penalty phase in one day.    (Doc. 40-12, p. 132) (describing the penalty phase process and stating "we should be through today").    As mitigating witnesses, Mr. Maxwell presented deposition testimony from a psychologist, Dr. James Crowder, and he called his mother-in-law, Lorna West, and his mother, Brenda Whitehurst.    (Doc. 40-12, pp. 158–202; Doc. 40-13, pp. 3–56; Doc. 40, pp. 41–46).    At the close of the penalty phase evidence, the trial court charged the jury. (Doc. 40-13, pp. 103–119).

The jury began deliberating at 3:05 p.m. on May 14.    (Doc. 40-13, p. 119; Doc. 40, p. 47).    Though the means of communication is not clear from the record, at 4:30 p.m., the trial court learned that the jury was deadlocked, and the jurors returned to the courtroom.    (*See* Doc. 40-13, p. 120; Doc. 40, p. 47).    The trial court instructed the jurors that they must continue deliberating and stated:

12

Let the record show that the jury has returned to the courtroom. And members of the jury, I'm sorry to hear that you're unable to reach a verdict. But I do want to tell you that the Court cannot release you at this time, and I'm not going to release you at this time. You should make further effort to arrive at a verdict.

Each juror is entitled to his or her opinion of the evidence, but I know that you do not wish to put the State to the expense of another trial if it can be avoided. If you cannot reach a verdict, a mistrial would be declared, and the case would have to be tried again. And there is no reason to believe that another jury would have better or clearer evidence than has been presented to you. This does not mean that you should surrender an honest conviction as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision, but you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If possible, you should resolve any differences and come to a conclusion so that the case may be completed. I will be happy to give you any explanatory charge with respect to the law, and if you have any questions with respect to the law, you would need to reduce it to writing, knock on the door and all come out here, and I will be glad to give you any explanatory charge about the law that you should – if you should desire one.

It is natural that differences of opinion will arise. When they do, each juror should not only express his or her opinion, but the facts and the reasons upon which he or she bases that opinion. By reasoning the matter out, it may be possible for jurors to reach a verdict.

What I've said to you must not be taken as an attempt on the part of the Court to require or force you to surrender your honest and reasonable convictions founded upon the law and evidence in this case. My sole purpose is to impress upon your duty under your oath and the desirability and importance of reaching a verdict if you can conscientiously do so. Remember that if you have any question about the law, you may come back and ask that, but you would have to reduce

13

it to writing and I would have to look at it with the attorneys before I could answer that.

You may retire and continue your deliberations.

(Doc. 40-13, pp. 120–22; Doc. 40, p. 47).   The jurors resumed their deliberations and returned to the courtroom, reportedly "at approximately 6:00 p.m."   (Doc. 40, p. 19).[4]   Voting ten to two, the jury recommended death as the appropriate punishment for Mr. Maxwell.   (Doc. 40-1, p. 31).

Following the penalty-phase verdict, the trial court held a sentencing hearing. (Doc. 40, p. 15).   The trial court accepted the jury's sentencing recommendation and imposed the death penalty.   (Doc. 40-20).   In its written order, the trial court included Mr. Maxwell's statement which "contain[s] a detailed account of the preparation, execution, and completion of the crimes for which [the] defendant was convicted."   (Doc. 40, p. 22; *see* Doc. 40, pp. 23–40).

The trial court found one aggravating circumstance—that "[t]he capital offense was committed while [Mr. Maxwell] was . . . committing . . . robbery."

---

[4] As discussed below, the transcript of the penalty phase does not indicate the time at which the jurors returned the penalty-phase verdict.   The trial judge wrote in a post-trial order that the jury returned the penalty-phase verdict "at approximately 6:00 p.m."   (Doc. 40, p. 19).

14

(Doc. 40, p. 48).[5]   As to mitigation, the trial court found that Mr. Maxwell had "no significant history of prior criminal activity" and "turn[ed] himself in to the authorities and . . . ma[de] a full confession."   (Doc. 40, pp. 49, 52).   The trial court noted that Mr. Maxwell waited "approximately one month" before confessing to the crimes.   (Doc. 40, p. 52).   The trial court rejected as a mitigating factor Mr. Maxwell's argument that his "participation was relatively minor."   (Doc. 40, p. 50).   The trial court pointed out that Mr. Maxwell described himself as "second in command" in his statement and acknowledged that he shot both victims.   (Doc. 40, p. 50).

The trial court found that Mr. Maxwell had not shown that he "acted under extreme duress or . . . the substantial domination of [Mr. Moore]."   (Doc. 40, p. 51).   The trial court noted that Mr. Maxwell "agreed to be a part" of Mr. Moore's plans and joined in without threats from Mr. Moore.   (Doc. 40, p. 50). Additionally, the group met at Mr. Maxwell's apartment before and after the crimes, and Mr. Moore "was not physically present" during the Pughs' murders.   (Doc. 40, pp. 50–51).   The trial court found that Mr. Maxwell's statement reflected his "control" and "initiative" in the murders and the bank robbery.   (Doc. 40, p. 51).

---

[5] This is the only aggravating circumstance on which the trial court charged the jury in the penalty phase.   (Doc. 40-13, pp. 109–10).

15

The trial court relied on Dr. Crowder's testimony that Mr. Maxwell tended to "tr[y] and blame others for his situation." (Doc. 40, p. 51). Based on Dr. Crowder's opinion, the trial court determined that Mr. Maxwell blamed Mr. Moore for his actions "simply [as] an expression of his (Mr. Maxwell's) personality rather than a true fear of Mark Moore." (Doc. 40, p. 51).

The trial court found that Mr. Maxwell did not suffer from a "substantial[] impairment" that impacted his ability "to appreciate the criminality of his conduct or . . . conform his conduct to the requirements of [the] law." (Doc. 40, p. 51). The trial court found that Mr. Maxwell was "wearing gloves going into the boat" and "cover[ed] up his actions . . . by disposing of his clothes" in case blood from the Pughs' murders were on them. (Doc. 40, pp. 51–52).

The trial court concluded "that the aggravating circumstance . . . weigh[]ed against the mitigating circumstances, compel[ling] . . . [the decision] to uphold the jury's advisory verdict." (Doc. 40, p. 52). Mr. Maxwell moved for a new trial; the trial court denied the motion. (Doc. 40, pp. 55, 91–94).

Mr. Gardner and Mr. Graham continued to represent Mr. Maxwell on direct appeal. (Doc. 40, p. 17; Doc. 40-14, p. 2). In May 2000, the Alabama Court of Criminal Appeals affirmed Mr. Maxwell's convictions and sentence and declined to

16

rehear the case.   *Maxwell Direct*, 828 So. 2d at 347, 369; (Doc. 40-14, p. 190). The Alabama Supreme Court and the United States Supreme Court denied certiorari review.   (Doc. 40-15, p. 124; Doc. 40-20, p. 60); *Maxwell Direct*, 828 So. 2d at 347; *Maxwell v. Alabama*, 537 U.S. 951 (2002).

On July 25, 2003, Mr. Maxwell signed and submitted to the Circuit Court of Jefferson County a 16-page *pro se* petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.   (Doc. 40-16, pp. 6–22).[6]   The state circuit court docketed the petition on July 30, 2003, (Doc. 40-17, p. 173); the petition bears the stamp of the Clerk of the Circuit Court of Jefferson County at the time, Anne-Marie Adams, (Doc. 40-16, p. 6).   Mr. Maxwell asserted multiple grounds for relief, including his contention that his trial attorneys were not "constitutionally effective," in part because they did not object to the trial court's *Allen* charge.   Mr. Maxwell explained that he was confined to his cell 23 hours per day and could not develop additional information to support his petition; discussed the importance of "competent legal assistance in the state post-conviction process" and requested court-appointed counsel to "protect both [his] state and federal rights;" and stated

---

[6] Mr. Maxwell used the Jefferson County case number on his petition.   At some point, someone wrote the Colbert County case number above the Jefferson County case number.   (Doc. 40-16, p. 6).

17

that in addition to the grounds asserted in his *pro se* petition, he sought relief for "such other reasons as may appear . . . upon further pleading." (Doc. 40-16, pp. 7, 15, 18, 21). Mr. Maxwell moved to proceed *in forma pauperis* and separately moved for the trial court to appoint counsel to represent him. (Doc. 40-16, pp. 23–26; Doc. 40-17, pp. 123–24). On July 30, 2003, a trial judge granted Mr. Maxwell's motion for *in forma pauperis* status but did not address Mr. Maxwell's other motions. (Doc. 40-16, pp. 3–5, 23).

On August 7, 2003, the State filed a motion in the Circuit Court of Jefferson County to toll the time for answering Mr. Maxwell's petition until an attorney was appointed to represent Mr. Maxwell in his Rule 32 proceedings. (Doc. 40-17, pp. 125–26, 128).[7] The State submitted a proposed order with its motion. (Doc. 40-17, p. 127). The proposed order indicated that Mr. Maxwell should have 45 days to amend his petition after the appointment of counsel. (Doc. 40-17, p. 127). The trial court did not rule on the State's motion to toll the deadline for the State's response and did not act on the State's request for appointment of counsel for Mr. Maxwell.

---

[7] The Jefferson County Circuit Court Clerk docketed the State's motion on August 14, 2003. (Doc. 40-17, p. 125).

18

On August 27, 2003, attorney Joseph Van Heest filed a notice of appearance for Mr. Maxwell in the Circuit Court of Jefferson County, and he filed a motion in which he asked the state trial court to appoint him as Mr. Maxwell's attorney pursuant to Rule 32.7 of the Alabama Rules of Criminal Procedure. (Doc. 40-17, pp. 129–32). In Mr. Van Heest's motion for appointment of counsel, he stated: "The Court has not yet appointed the undersigned counsel pursuant to Rule 32.7(c)." (Doc. 40-17, p. 131). The trial court did not rule on Mr. Van Heest's motion for appointment as Mr. Maxwell's Rule 32 attorney. (Doc. 40-17, pp. 131–32, 173).[8]

For nearly 20 months, there was no activity in Mr. Maxwell's Rule 32 proceedings. (Doc. 40-16, p. 4; Doc. 40-17, p. 173). On April 19, 2005, a new attorney signed a notice of appearance for the State, (Doc. 40-16, pp. 27–28), and a motion to summarily dismiss Mr. Maxwell's *pro se* petition, (Doc. 40-16, pp. 29–63). The new attorney appears to have mailed the motions to the Circuit Court of Colbert County. (*See* Doc. 40-16, pp. 27, 29). The State provided to the Circuit Court of Colbert County a draft of a 36-page proposed order granting the State's

---

[8] Neither the State's motion to toll and request to appoint counsel for Mr. Maxwell nor Mr. Van Heest's motion for the trial court to appoint him as Mr. Maxwell's Rule 32.7 attorney appears in the original index for Mr. Maxwell's appeal to the Alabama Court of Criminal Appeals from the trial court's summary dismissal of his Rule 32 petition. (Doc. 40-16, p. 3). Those submissions were added to the record on appeal through a supplement. (Doc. 40-17, pp. 117–18).

motion to dismiss.   (Doc. 40-17, pp. 133–69).   On April 20, 2005, Mr. Maxwell's Rule 32 proceeding was reassigned to a Colbert County judge.   (Doc. 40-20, p. 101).[9]   On April 21, 2005, the state circuit court docketed the State's motion, (Doc. 40-17, p. 173); the motion bears the stamp of the Clerk of the Circuit Court of Colbert County, Phillip Bowling, (Doc. 40-16, p. 29).

Five days later, on April 26, 2005, the newly-assigned trial judge signed the State's proposed order summarily dismissing Mr. Maxwell's Rule 32 proceeding, deleting the word "proposed" on the first page of the order.   (Doc. 40-17, p. 173; Doc. 40-20, pp. 61–97; Doc. 40-17, pp. 133–69).   The order that the State prepared states that Mr. Maxwell's "plan[] [to] fil[e] an amended Rule 32 petition" tolled "the State's time for filing an answer."   (Doc. 40-20, p. 67 n. 2).   The order that the State drafted states that Mr. Maxwell had "ample opportunity to," but never did, amend his petition.   (Doc. 40-20, p. 67 n. 2).   For reasons that are unclear from the record, the new trial judge signed the State's proposed final order on May 10 (or

---

[9] The Rule 32 manual docket sheet does not reflect the date on which the new state-court judge was assigned to Mr. Maxwell's Rule 32 proceeding.   (Doc. 40-17, p. 173; Doc. 40-20, p. 98).   In its decision concerning Mr. Maxwell's Rule 32 petition, the Alabama Court of Criminal Appeals reported that the case was reassigned to a new trial court judge on April 20, 2005.   (Doc. 40-20, p. 101).   A supplement to the proceedings before the Court of Criminal Appeals, (Doc. 40-17, p. 171), contains an "on-line case action summary sheet" from Colbert County that indicates that Mr. Maxwell's Rule 32 proceeding was assigned to a new judge on April 20, 2005, (Doc. 40-17, p. 175).

perhaps May 17, the handwriting is unclear), 2005, two weeks after she signed the April 26 order and had the April 26 order docketed.  (*Compare* Doc. 40-17, pp. 133–69 *with* Doc. 40-20, pp. 61–97; *see* Doc. 40-17, p. 173).   The May 10 version of the order that the trial judge signed contains the word "Proposed" on the first page of the order.  (Doc. 40-17, p. 133).   This version of the order bears the Clerk of Court's May 17 date stamp, (Doc. 40-17, p. 133), but this version of the order does not appear on the docket sheet for Mr. Maxwell's Rule 32 proceeding, (Doc. 40-17, p. 173).

On May 18, 2005, attorney Katherine Puzone appeared for Mr. Maxwell and moved for reconsideration of the trial court's summary dismissal of Mr. Maxwell's *pro se* Rule 32 petition.   (Doc. 40-16, pp. 4, 103–30).   Ms. Puzone stated that she used the State's proposed order to prepare the motion to reconsider because she "ha[d] not yet received" a copy of the April 26 final order.   (Doc. 40-16, p. 105). Ms. Puzone argued that Mr. Maxwell did not have a fair opportunity to respond to the State's motion to dismiss because the trial court entered the State's proposed order "within five days of receiving it."   (Doc. 40-16, p. 106).   Ms. Puzone requested permission to file an amended Rule 32 petition.   (Doc. 40-16, p. 106).

A few days later, Ms. Puzone filed a motion to amend Mr. Maxwell's *pro se* petition and attached a proposed amended petition.    (Doc. 40-16, pp. 4–5, 131–203; Doc. 40-17, pp. 3–80).

The State opposed Mr. Maxwell's motion for reconsideration and moved to strike Mr. Maxwell's proposed amended petition.    (Doc. 40-17, pp. 89–98).    The State acknowledged that the motion was timely but argued that reconsideration was inappropriate because Mr. Maxwell had been dilatory in proposing an amended petition.    (Doc. 40-17, pp. 94–95).

Mr. Maxwell replied that he did not have a fair opportunity to respond to the State's motion to dismiss and argued that dismissal of his petition without an opportunity to respond violated his due process rights.    (Doc. 40-17, p. 83).    Mr. Maxwell added that because his petition was "[f]acially [s]ufficient," the trial court's [d]ismissal [w]ithout an [e]videntiary [h]earing was [i]nappropriate."    (Doc. 40-17, p. 84) (underlining omitted).    He argued that if the trial court believed his Rule 32 petition was facially deficient, then pursuant to Rule 32.7(d), the trial court should have permitted him to amend his petition.    (Doc. 40-17, p. 101).

Mr. Maxwell's new attorney noted that she learned about the trial court's April 26 dismissal of Mr. Maxwell's Rule 32 petition, not from the trial court but

22

from the State's attorney when her office called him concerning a brief extension of time to amend. (Doc. 40-17, p. 99). Mr. Maxwell argued that if Mr. Van Heest had failed to amend the petition "with appropriate expediency," then "the penalty should accrue to counsel, not [the] indigent death-sentenced client." (Doc. 40-17, pp. 103–04).

The Colbert County trial judge denied Mr. Maxwell's motion to reconsider, (Doc. 40-17, p. 106), but did not rule on Mr. Maxwell's motion to amend, (Doc. 40-16, pp. 3–5). Mr. Maxwell appealed, and the Alabama Court of Criminal Appeals affirmed the summary dismissal of Mr. Maxwell's *pro se* Rule 32 petition. (Doc. 40-17, pp. 108–09; Doc. 40-20, p. 137). Mr. Maxwell applied for rehearing but was unsuccessful. (Doc. 40-20, p. 138). The Alabama Supreme Court denied certiorari review. (Doc. 40-20, p. 139).

Mr. Maxwell next sought federal habeas relief. (Doc. 1). Mr. Maxwell has amended his petition once, and the parties have filed briefs. (Docs. 8, 41, 47–49).

## II.

A writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). "[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a

final judgment." *Brecht*, 507 U.S. at 634 (internal quotation marks and citation omitted). This is particularly so in cases like this that are "governed by 28 U.S.C. § 2254, as amended by the Anti–Terrorism and Effective Death [Penalty] Act of 1996 (AEDPA)." *Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011) (explaining that AEDPA applies to habeas petitions filed after April 24, 1996).

When a state court has adjudicated a federal constitutional claim on the merits and AEDPA applies, "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)) (internal quotation marks omitted); *see Woodford v. Viscotti*, 537 U.S. 19, 27 (2002) (stating that under § 2254(d), the "federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable."). Under AEDPA, to warrant federal habeas relief on a state-adjudicated constitutional challenge to a state court judgment, a petitioner must establish a violation of his constitutional rights and demonstrate that the state court's resolution of the constitutional issue falls within § 2254(d)(1) or (d)(2). *See* 28 U.S.C. § 2254(d)

24

(stating that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in [s]tate court proceedings unless" certain conditions or exceptions codified in (d)(1) or (d)(2) apply).   Under § 2254(d)(1), federal habeas relief is available to a petitioner who demonstrates that a state court's ruling on a constitutional challenge "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1).   Under § 2254(d)(2), a petitioner may obtain federal habeas relief by demonstrating that the state court's analysis of a federal constitutional question "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in . . . [s]tate court."   28 U.S.C. § 2254(d)(2); *see Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(d)).

For purposes of § 2254(d)(1), "clearly established Federal law" consists of United States Supreme Court holdings, not dicta, that predate the last adjudication of the merits of a federal constitutional issue in state court on direct appeal.   *Greene v. Fisher*, 565 U.S. 34, 36, 38–40 (2011) (internal quotation marks omitted); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).   Under § 2254(d)(1), a federal court must "focu[s] on what a state court knew and did," and "measure state-court

25

decisions" against Supreme Court precedent "*as of the time the state court renders its decision*" on direct appeal.    *Greene*, 565 U.S. at 38 (first alteration and italics in *Greene*) (internal quotation marks omitted).

"[T]he 'contrary to' and 'unreasonable application' clauses" of § 2254(d)(1) are "independent statutory modes of analysis."    *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).    A state-court decision "is contrary to . . . clearly established precedents" of the United States Supreme Court, for example, if the state court "applies a rule that contradicts the governing law set forth" in United States Supreme Court decisions, or if the state court "confronts a set of facts that is materially indistinguishable from a decision of [the United States Supreme Court] but reaches a different result."    *Brown v. Payton*, 544 U.S. 133, 141 (2005).    The term "contrary to" in § 2254(d)(1) "suggests that the state court's decision must be substantially different from the relevant precedent" of the United States Supreme Court.    *Williams*, 529 U.S. at 405; *see Alderman*, 468 F.3d at 791.

The "unreasonable application" clause operates with respect to "a run-of-the-mill state-court decision applying the correct legal rule from" Supreme Court decisions "to the facts of a prisoner's case."    *Williams*, 529 U.S. at 406; *see Alderman*, 468 F.3d at 791 (stating that in run-of-the-mill state-court decisions in

26

which state courts cite the correct legal standard, "the companion 'unreasonable application' provision of § 2254(d)(1) is the proper statutory lens"). Here, "[t]he pivotal question" is "whether the state court's application of clearly established federal law was objectively unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011); *Williams*, 529 U.S. at 409. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (italics in *Williams*). If a state court denies a federal constitutional challenge to a state court conviction as meritless and "'fairminded jurists could disagree' on the correctness of the state court's decision," then habeas relief under AEDPA's unreasonable application clause is not available. *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When applying the objectively unreasonable standard, a federal court must "consider[] the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664) (internal quotation marks omitted).

To obtain relief under § 2254(d)(2), a petitioner must demonstrate that a state court, in deciding the petitioner's constitutional challenge to his state-court conviction, relied on "an unreasonable determination of the facts in light of the

27

evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[W]hen a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding, [a federal] [c]ourt is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Corr. Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (some alterations added) (internal quotation marks omitted) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc)).

AEDPA contains a second provision "governing federal-court review of state-court factual findings." *Wood*, 558 U.S. at 293. "Under § 2254(e)(1), 'a determination of a factual issue made by a State court shall be presumed to be correct,' and the petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Wood*, 558 U.S. at 293 (quoting 28 U.S.C. § 2254(e)(1)). The Supreme Court has not addressed the exact relationship between § 2254(e)(1) and § 2254(d)(2). *Wood*, 558 U.S. at 304–05

28

("[W]e leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2)."). In the Eleventh Circuit, a petitioner who challenges a constitutional ruling factually must satisfy AEDPA's (d)(2) and (e)(1) standards. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc). "Even if the state court made a clearly erroneous factual determination," a petitioner may not prevail under (d)(2) unless the decision, "taken as a whole," rests on "an 'unreasonable determination of the facts.'" *Pye*, 50 F.4th at 1035 (quoting 28 U.S.C. § 2254(d)(2)).

With this legal framework in mind, the Court turns to Mr. Maxwell's arguments for federal habeas relief.

### III.

### *Coerced Capital Verdict*

Mr. Maxwell contends that the trial court violated his right to due process, his Sixth Amendment right to an impartial jury trial and a unanimous verdict, and his Eighth and Fourteenth Amendment rights "to a fair trial and reliable sentencing" when, during the penalty phase of his case, the trial court, *sua sponte* gave a coercive *Allen* charge after the jurors indicated that they could not reach a verdict. (Doc. 8,

pp. 4–5, 186–88; *see also* Doc. 1, pp. 4–5, 65, 180–82).[10]   Mr. Maxwell points out

that the Supreme Court has held that "[a]ny criminal defendant, and especially any

capital defendant, being tried by a jury is entitled to the uncoerced verdict of that

body."   (Doc. 8, p. 187) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988)).

Mr. Maxwell focuses on the following language in the trial court's *Allen* charge:

> You should make further effort to arrive at a verdict.   Each juror is
> entitled to his or her opinion of the evidence, but I know that you do
> not wish to put the State to the expense of another trial if it can be
> avoided.   If you cannot reach a verdict, a mistrial would be declared,
> and the case would have to be tried again.   And there is no reason to
> believe that another jury would have better or clearer evidence than has
> been presented.

(Doc. 8, p. 186).   Mr. Maxwell asserts:

> The *Allen* instruction given in this case tended to coerce the jury into
> reaching a verdict in two ways.   First, the Court's emphasis on the
> expense of Mr. Maxwell's trial served "to discourage jurors in the
> minority and to pressure them to abandon their honestly held beliefs,
> not in response to considerations regarding the [penalty given to] the
> defendant, but in response to the expediency of saving expenses."
> *United States v. Rey*, 811 F.2d 1453, 1459 (11th Cir. 1987).   Further,
> the admonishment regarding expense to the State is misleading because
> it suggested to the jury that if it failed to reach a decision as to

---

[10] In *Allen v. United States*, the Supreme Court "upheld an instruction urging the jury to reach a verdict."   *United States v. Rey*, 811 F.2d 1453, 1458 (11th Cir. 1987) (citing *Allen v. United States*, 164 U.S. 492 (1896)).

In his initial petition, Mr. Maxwell argued that the *Allen* charge violated his right to due process, his Sixth Amendment right to an impartial jury, and his "Eighth and Fourteenth Amendment rights to a fair trial and reliable sentencing proceeding."   (Doc. 1, p. 67).   He raised the same constitutional provisions in his amended petition.   (Doc. 8, pp. 73, 188).

punishment the result would be a mistrial which would require the entire case (including the guilt phase) to be re-tried. This is clearly not the law, and it was inappropriate for the judge to suggest otherwise.

Second, the emphasis on the expense of the trial to the State also indicated to the minority that holding out for their position was pointless, because the majority view would prevail on retrial.    That the jury reached a verdict only fifteen minutes after receiving the *Allen* charge also indicates that they felt compelled to reach a verdict.

(Doc. 8, pp. 187–88) (brackets in Doc. 8).    Warden Raybon argues that Mr. Maxwell's contention does not overcome AEDPA deference.    (Doc. 41, p. 78).

Mr. Maxwell asserted this argument concerning the trial court's penalty-phase *Allen* charge on direct appeal, and the Alabama Court of Criminal Appeals addressed the argument on the merits.    (Doc. 40-14, pp. 35–36); *Maxwell Direct*, 828 So. 2d at 364–66.    The Court of Criminal Appeals quoted the trial court's entire *Allen* instruction:

"By The Court: Let the record show that the jury has returned to the courtroom. And members of the jury, I'm sorry to hear that you're unable to reach a verdict. But I do want to tell you that the Court cannot release you at this time, and I'm not going to release you at this time. You should make further efforts to arrive at a verdict.

"Each juror is entitled to his or her opinion of the evidence, but I know that you do not wish to put the State to the expense of another trial if it can be avoided. If you cannot reach a verdict, a mistrial would be declared, and the case would have to be tried again. And there is no reason to believe that another jury would have better or clearer evidence than has been presented to you. This does not mean that you should

31

surrender an honest conviction as to the weight or the effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision, but you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor.  If possible, you should resolve any differences and come to a conclusion so that the case may be completed. I will be happy to give you any explanatory charge with respect to the law, and if you should have any questions with respect to the law, you would need to reduce it to writing, knock on the door and all come out here, and I will be glad to give you any explanatory charge about the law that you should—if you should desire one.

"It is natural that differences of opinion will arise. When they do, each juror should not only express his or her opinion, but the facts and the reasons upon which he or she bases that opinion. By reasoning the matter out, it may be possible for jurors to reach a verdict.

"What I've said to you must not be taken as an attempt on the part of the Court to require you to surrender your honest and reasonable convictions founded upon the law and the evidence in this case. My sole purpose is to impress upon your duty under your oath and the desirability and importance of reaching a verdict if you can conscientiously do so. Remember that if you have any question about the law, you may come back and ask that, but you would have to reduce it to writing and I would have to look at it with the attorneys before I could answer that.

"You may retire and continue your deliberations."

*Maxwell Direct*, 828 So. 2d at 364–65 (citing R. 1085–87*,* found at Doc. 40-13, pp. 120–22).   The Court of Criminal Appeals stated that the trial court gave this instruction "approximately an hour and a half after the jury began its deliberations at the sentencing phase of the trial" because "the jury had indicated that it was

32

deadlocked."  *Maxwell Direct*, 828 So. 2d at 364.   After the trial court gave the *Allen* charge, the jury recommended the death penalty by a ten to two vote. *Maxwell Direct*, 828 So. 2d at 365.    The Alabama Court of Criminal Appeals stated that "the record does not indicate at what time" the jury returned its penalty phase recommendation.   *Maxwell Direct*, 828 So. 2d at 365.

Mr. Maxwell's trial attorneys did not object to the *Allen* charge, so the Alabama Court of Criminal Appeals reviewed Mr. Maxwell's challenge to the charge in his direct appeal for plain error.   *Maxwell Direct*, 828 So. 2d at 364; (Doc. 40-13, p. 122).[11]   Under Alabama Appellate Procedure Rule 45A, "[i]n all cases in which the death penalty has been imposed, the Court of Criminal Appeals may . . . notice any plain error or defect in the [capital] proceedings under review, whether . . . brought to the attention of the trial court, and take appropriate . . . action . . . whenever such error has or probably has adversely affected the substantial right of the appellant."   Ala. R. App. P. 45A.   Mr. Maxwell's trial attorneys continued to represent him on direct appeal and argued to the Court of Criminal Appeals that the instruction, "I know that you do not wish to put the [S]tate to the expense of another

---

[11] As discussed below, Mr. Maxwell challenges the assistance he received from his trial attorneys based on his attorneys' failure to object to the *Allen* charge.   (Doc. 1, pp. 65–67; Doc. 8, pp. 71–73).

33

trial if it can be avoided.   If you cannot reach a verdict, a mistrial would be declared and the case would have to be tried again," was "misleading and had a coercive effect on the jury" because the charge indicated that if the jurors "did not reach a decision as to punishment, a mistrial could be declared and the entire trial process, including the guilt phase[,] would be required."   (Doc. 40-14, pp. 35–36).   Mr. Maxwell asserted that this aspect of the *Allen* charge "put an undue burden on those members of the jury who were holding out for, or recommending, a sentence of life without parole."   (Doc. 40-14, p. 35).

The Alabama Court of Criminal Appeals stated that the trial court's *Allen* charge "in no way suggested what sentencing verdict should be returned, nor did the trial court use 'coercive or threatening' language."   *Maxwell Direct*, 828 So. 2d at 365.   The Court of Criminal Appeals concluded that, "[i]n the context of the entire trial, the charge simply was not 'coercive and censorious.'"   *Maxwell Direct*, 828 So. 2d at 365.   With respect to the expense portion of the charge, the Court of Criminal Appeals concluded that the trial court did not provide "an entirely accurate statement of the law," but the instruction "was not so misleading as to constitute plain error."   *Maxwell Direct*, 828 So. 2d at 366.   The Court of Criminal Appeals wrote that although "only the sentencing phase of the trial would have to be retried,

in a real sense, because the State, as well as the defense, would have to present all of the evidence from the guilt phase to a new sentencing jury, the guilt phase, for all intents and purposes, must also be retried" such that "the time and expense of presenting the guilt phase again would be essentially the same." *Maxwell Direct*, 828 So. 2d at 366. The Court of Criminal Appeals concluded that the *Allen* charge did not "rise to the level of 'plain error' that would justify a reversal of Maxwell's sentence." *Maxwell Direct*, 828 So. 2d at 367. The Court of Criminal Appeals wrote: "In accordance with Rule 45A, Ala. R. App. P., we have examined the record for any plain error with respect to Maxwell's capital murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial." *Maxwell Direct*, 828 So. 2d at 367.

## A.

Before discussing the merits of Mr. Maxwell's constitutional challenge to the *Allen* charge under §§ 2254(d)(1) and 2254(d)(2), the Court draws attention to a procedural matter that complicates the analysis in this case. For reasons that are not clear from the record, the transcript of the penalty phase of Mr. Maxwell's trial has material omissions. For example, the transcript reflects that the jury retired to

35

deliberate in the penalty phase at 3:05 p.m.   (Doc. 40-13, p. 119).   At 4:25 p.m., Mr. Maxwell and the members of the jury returned to the courtroom.   (Doc. 40-13, p. 120).   The trial judge stated:   "Let the record show the jury has returned to the courtroom.   And members of the jury, I am sorry to hear that you're unable to reach a verdict."   (Doc. 40-13, p. 120).   The trial court then gave the *Allen* charge recounted above.   (Doc. 40-13, pp. 120–22).

Nothing in the transcript indicates how the trial court learned that the jury "was unable to reach a verdict."   The Court has not found a note from the jury in the record, and the penalty-phase transcript contains no information about how the jury communicated with the trial judge or how the jurors described their purported inability to reach a verdict.   Moreover, there is no indication that the attorneys received notice that the jury was at an impasse before the trial judge gave the *Allen* charge, and there is no indication that the lawyers had an opportunity to either read any message that the jury may have provided or discuss with the trial court appropriate steps to take if the jury was deadlocked.   At the beginning of the trial, Mr. Maxwell filed a motion in which he asked for the opportunity to review jury instructions before the trial court gave instructions to the jury.   (Doc. 40, pp. 71–72).   The record does not indicate that the trial judge gave the attorneys for the

36

parties an opportunity to review the *Allen* charge before the judge gave the charge to the jury.

The penalty-phase transcript indicates that following the *Allen* charge, the jury returned to the jury room to resume deliberations at 4:30 p.m.    (Doc. 40-13, p. 122). That is the last time stamp in the transcript.    After the jurors returned to the jury room, while they deliberated, the trial judge told the lawyers that her "clerk, Maggie Williamson, ha[d] just informed [her] that the jury had a question," and Ms. Williamson "brought it to us," and the jury "asks for a copy of the deposition of Dr. Crowder," a mitigation witness.    (Doc. 40-13, pp. 122–23).    The Court has not found in the record written requests from the jury for evidence.    The lawyers for the parties agreed that the jurors could have a copy of the Crowder deposition. (Doc. 40-13, p. 123).    Then, without a time stamp, the transcript states:    "(After a short break, the jury returned to the courtroom)."    (Doc. 40-13, p. 123).    At that point, the jury provided its recommendation of the death penalty.    (Doc. 40-13, pp. 123–24).

The Court has combed the record of the trial court proceedings to attempt to fill the gaps in the trial transcript.    The Court has located only one order that potentially sheds light on the omissions from the penalty phase transcript.    In its

37

post-trial sentencing order, the trial court stated that the jury returned its penalty phase verdict "at approximately 6:00 p.m."   (Doc. 40, p. 19).   In the order, the trial court also stated:   "The jury deliberated and during deliberations came out and informed the Court that they could not reach a verdict."   (Doc. 40, p. 47).   Again, the penalty-phase transcript does not capture the remarks that a juror or jurors made to the trial court, and the Court has not found a trial court docket entry indicating that the jury returned to the courtroom and verbally informed the trial court that they were deadlocked.

These omissions from the penalty-phase record are significant because they make it difficult for the Court to assess all aspects of Mr. Maxwell's argument that the *Allen* charge in the penalty phase violated his constitutional rights.   The absence of information about the way in which the jurors informed the trial court that they were "unable to reach a verdict", (Doc. 40-13, p. 120) – assuming the jury used such language – prevents the Court from assessing the need for an *Allen* charge in the first instance.   The Supreme Court has examined the language jurors use to communicate their status as part of the evaluation of the coercive impact of an *Allen*

charge.[12]    The time between an *Allen* charge and a jury's verdict also is a significant

consideration in the evaluation of the coerciveness of an *Allen* charge.[13]

The omissions from the penalty phase record also are significant because

before his trial began, Mr. Maxwell filed a "Motion for Full Recordation of All

Proceedings."   (Doc. 40, pp. 115–117).   In the motion, Mr. Maxwell asked the

trial court to:

> direct the official court reporter to record and transcribe all of the
> proceedings in all phases of [his case], including pretrial hearings, legal
> arguments, voir dire and selection of the jury, in-chambers conferences,
> bench conferences, any discussions regarding jury instructions and all
> matters during the trial, pursuant to the Sixth, Eighth, and Fourteenth
> Amendments to the United States Constitution and Article I of the
> Alabama Constitution.

(Doc. 40, p. 115).   Mr. Maxwell argued that it was "vitally important that the record

on appeal fully reflect all of the proceedings in the trial court, and, accordingly, all

matters must be transcribed."   (Doc. 40, p. 115).   Mr. Maxwell continued:

> The failure to record the entire proceedings in the trial court and make
> them part of the record violates an accused's right to full review of his
> case on appeal, his right to the assistance of counsel on appeal and

---

[12] *See Lowenfield*, 484 U.S. at 234; *Romine v. Georgia*, 484 U.S. 1048, 1049–50 (1988) (Marshall, J., dissenting).

[13] *Lowenfield*, 484 U.S. at 240; *see also United States v. Woodward*, 531 F.3d 1352, 1364 (11th Cir. 2008) ("In assessing whether the charge was coercive, we consider the language of the charge and the totality of the circumstances under which it was delivered, e.g., whether the court conducted a full poll of the jury before giving the charge and the amount of time between the delivery of the charge and the return of the jury's verdict.").

postconviction, and his right to equal access to the courts that would review any conviction on appeal or collateral attack, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Doc. 40, p. 115).

Citing *Harris v. State*, 552 So. 2d 857 (Ala. Cr. App. 1987), and *Watters v. State*, 369 So. 2d 1272 (Ala. 1979), Mr. Maxwell asserted that the "Alabama Supreme Court has held in capital cases that there exists 'a duty to examine the entire record to determine whether any error exists prejudicial to the defendant.'" (Doc. 40, p. 116) (quoting *Harris v. State*, 552 So. 2d 857 (Ala. Cr. App. 1987)) (underline in motion). Mr. Maxwell included in his request for transcription "the jury instructions and the charge conference, [and] any questions raised by the jury." (Doc. 40, p. 117). Given Mr. Maxwell's express request for a complete record, the gaps in the penalty-phase transcript are particularly concerning.[14]

The Eleventh Circuit has explained that in *Hardy v. United States*, the Supreme Court concluded that a "criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial." *United States v. Cashwell*, 950 F.2d 699, 703 (11th Cir. 1992) (citing *Hardy v. United States*, 375

---

[14] The Court has not located in the record a ruling on Mr. Maxwell's motion for a complete recording of all of the proceedings in his trial.

40

U.S. 277 (1964)).    A "merely technically incomplete record, involving no substantial or significant omissions, will not be sufficient to work a reversal," and the "lack of a verbatim transcript does not constitute a substantial or significant omission nor a constitutional defect when a suitable alternative is provided." *Cashwell*, 950 F.2d at 703 (quoting *United States v. Selva,* 559 F.2d 1303, 1306 n.5 (5th Cir.1977)) (first citing *Mayer v. City of Chicago,* 404 U.S. 189, 194 (1971); then citing *Harris v. Estelle,* 583 F.2d 775, 777 (5th Cir. 1978); and then citing *Morgan v. Massey,* 526 F.2d 347, 348 (5th Cir.), *cert. denied,* 429 U.S. 1002, (1976)). Quoting *Mayer*, the Eleventh Circuit stated that:

> alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise. A statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judge's minutes taken during trial or on the court reporter's untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes, equally as good as a transcript.

> *Mayer,* 404 U.S. at 194. A reconstructed record, as opposed to a verbatim transcript, can accord effective appellate review, particularly where appellate rules have established a procedure for reconstruction of the trial record.

*Cashwell*, 950 F.2d at 703.

41

Here, using the trial court's sentencing order, the Court may attempt to reconstruct the time at which the jury returned its penalty-phase verdict, but the Court has not found other materials in the trial court record that would help the Court fill the gaps in the penalty-phase transcript.    Against this backdrop, the Court turns to Mr. Maxwell's factual and legal challenges to the state court findings regarding the jury's penalty-phase deadlock and the trial court's *sua sponte Allen* charge.

**B.**

Because the factual findings involved in the analysis under § 2254(d)(2) inform some of the § 2254(d)(1) analysis of the state courts' resolution of the merits of Mr. Maxwell's constitutional challenge to the *Allen* charge*,* the Court begins with the state courts' factual findings.    As noted, in his federal habeas petition, Mr. Maxwell asserts that the speed with which the jury returned its sentencing recommendation following the *Allen* charge evidences the coercive effect of the charge.    (Doc. 8, p. 1878).    Mr. Maxwell contends that "within fifteen minutes" of returning to deliberations after the *Allen* charge, "the jury returned a sentence recommendation of death by a vote of 10-2."    (Doc. 8, p. 187, ¶ 254).[15]    The Court

---

[15] In his amended habeas petition, Mr. Maxwell cites R.1089 which corresponds to Doc. 40-13, p. 124.   The reference to R. 1089 appears to be a typographical error because the transcript notation, "(After a short break, the jury returned to the courtroom)" appears at R. 1088, Doc. 40-13, p. 123.

of Criminal Appeals stated that "the record does not indicate at what time" the jury returned its penalty phase recommendation.  *Maxwell Direct*, 828 So. 2d at 364. The trial court record does not fully support either factual assessment.

The trial transcript shows that the sentencing phase began on May 14, perhaps at 9:00 a.m.   (Doc. 40-12, pp. 131–32).[16]   That afternoon, the jury retired to deliberate at 3:05 p.m. and returned 80 minutes later at 4:25 p.m., having somehow communicated to the trial court that they could not reach a verdict.   (Doc. 40-13, pp. 119–20).   After the trial court gave the *Allen* charge, the jury returned to the jury room at 4:30 p.m.   (Doc. 40-13, pp. 120–22).   The jurors requested Dr. Crowder's deposition, (Doc. 40-13, pp. 122–23; *see* Doc. 40-8, p. 41; Doc. 40-12, p. 158); the attorneys for the parties stipulated that the jurors could have a copy of the deposition transcript, (Doc. 40-13, p. 123); and, "([a]fter a short break, the jury returned to the courtroom)" and the jury returned a 10-2 verdict, (Doc. 40-13, pp. 123–24).   The trial court's June 30 sentencing order indicates that the jury returned

---

[16] The jury returned its guilt phase verdict at 6:05 p.m. on May 13.  (Doc. 40-12, p. 129).  The trial court instructed the jurors to return to court the following morning at 9:00 a.m.  (Doc. 40-12, p. 131).   The trial transcript does not indicate the time at which the penalty-phase of Mr. Maxwell's trial began on May 14.  (Doc. 40-12, p. 132).  Given the trial court's May 13 instruction to the jurors to return the following morning at 9:00 a.m., the penalty phase likely began the morning of May 14 at approximately 9:00 a.m.

its advisory penalty phase verdict "at approximately 6:00 p.m."  (Doc. 40, pp. 19

(time of penalty-phase verdict), 52 (date of sentencing order)).[17]

Accepting the trial court's statement in the sentencing order that the jury

returned the sentencing phase verdict at approximately 6:00 p.m., it appears that,

following the *Allen* charge, the jury was in the jury room for 90 minutes before the

jury reached the 10-2 penalty-phase verdict.[18]  The Court of Criminal Appeals'

factual finding that the trial court "record does not indicate at what time" the jury

returned its sentencing recommendation does not account for the sentencing order

---

[17] The penalty phase verdict form does not have a date and time stamp.   (*See* Doc. 40-1, p. 31).

[18] There is a factual inconsistency between the penalty phase transcript and the trial judge's sentencing order that suggests that the trial judge's notes, or her interpretation of her notes, may not have been entirely accurate.  In her June 30 sentencing order, the trial judge wrote that, following the *Allen* charge, "the jury requested a copy of the transcript of the defendant's statement and a copy of Dr. Crowder's deposition, and both documents were submitted to the jury by consent of the State and the Defense."  (Doc. 40, p. 47).  The penalty phase transcript reflects that the jury requested a transcript of Mr. Maxwell's statement to police before the jury announced that it could not reach a verdict, (Doc. 40-13, p. 119), and the jury requested Dr. Crowder's deposition transcript after the jury resumed deliberations following the *Allen* charge, (Doc. 40-13, pp. 122–23).  The Court notes too that the jury returned its guilt-phase verdict at 6:05 p.m. on May 13, (Doc. 40-12, p. 129), so the trial judge could have misread her notes from the trial when she reported that the jury returned its penalty-phase verdict at approximately 6:00 p.m. on May 14.   In her sentencing order, the trial judge stated that the jury returned its guilt-phase verdict "at approximately 6:00 p.m." and its penalty-phase verdict the following day "at approximately 6:00 p.m."  (Doc. 40, p. 19).   Taken together, these aspects of the record make the Court somewhat leery about relying on the "approximately 6:00 p.m." detail in the sentencing order, given the transcript notation that the jury returned with its verdict "after a short break" sometime after 4:30 p.m. and Mr. Maxwell's contention that the jury returned its penalty phase verdict 15 minutes after the trial court gave the *Allen* charge.

44

in which the trial judge stated that the jury returned its sentencing recommendation on "May 14, 1998 at approximately 6:00 p.m."   (Doc. 40, p. 19); *Maxwell Direct*, 828 So. 2d at 367.   Based on its finding that the trial court record did not indicate the time at which the jury returned its sentencing recommendation, the Court of Criminal Appeals did not consider the extent to which the length of the jury's deliberations following the *Allen* charge suggests that the *Allen* charge was coercive.

## C.

To answer the question § 2254(d)(1) poses – whether Mr. Maxwell has demonstrated that the Court of Criminal Appeals rejected the merits of his constitutional claim in a manner "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," the Court first must identify the caselaw relevant to the inquiry. The Court may consider only Supreme Court decisions issued before May 26, 2000, the date on which the Alabama Court of Criminal Appeals issued its decision in Mr. Maxwell's direct appeal.   *Maxwell Direct*, 828 So. 2d at 347.   The Supreme Court decisions that Mr. Maxwell cites, *Jenkins v. United States*, 380 U.S. 445 (1965) (per curiam), and *Lowenfield v. Phelps*, 484 U.S. 231 (1988), (Doc. 8, pp. 187–88), meet these criteria.

45

The defendant in *Jenkins* was charged with robbery and assault with intent to rob. *Jenkins*, 380 U.S. at 445. After deliberating "[s]lightly more than two hours," the *Jenkins* jury informed the trial court in a note that the jurors could not "agree upon a verdict 'on both counts because of insufficient evidence.'" *Jenkins*, 380 U.S. at 446. The trial judge called the jurors into the courtroom and stated: "'You have got to reach a decision in this case.'" *Jenkins*, 380 U.S. at 446. The jury found the defendant "guilty" on the first count and "not guilty" on the second. *Jenkins*, 380 U.S. at 445. The Supreme Court did not indicate how long the jurors deliberated after the trial judge's instruction; the Supreme Court addressed only the content of the instruction. The Supreme Court determined that, "in its context and under all the circumstances the judge's statement had the coercive effect attributed to it," and the Supreme Court reversed the judgment against the defendant and remanded the case for a new trial. *Jenkins*, 380 U.S. at 446. The Supreme Court noted that in his brief, the Solicitor General wrote: "the principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." *Jenkins*, 380 U.S. at 446 (internal quotation marks omitted). The Supreme Court did not elaborate further.[19]

---

[19] Later, in *U.S. v. U.S. Gypsum Co.*, the United States Supreme Court stated that, in *Jenkins*, "we held an instruction directing the jury that it *had* to reach a verdict was reversible error." 438 U.S.

46

Unlike *Jenkins*, the *Lowenfield* decision concerns an *Allen* charge given in the penalty phase of a case involving multiple murders.    *Lowenfield*, 484 U.S. at 233. After finding the defendant guilty of two counts of manslaughter and three counts of first-degree murder, the jury began deliberations concerning sentencing. *Lowenfield*, 484 U.S. at 233.    The jury charge for the sentencing phase:

> included the familiar admonition that the jurors should consider the views of others with the objective of reaching a verdict, but that they should not surrender their own honest beliefs in doing so. The court also charged the jury that if it were unable to reach a unanimous recommendation, the court would impose a sentence of life imprisonment without the possibility of probation, parole, or suspension of sentence.

*Lowenfield*, 484 U.S. at 234.    After deliberating for approximately one day, the foreperson sent the trial judge a note which indicated that the jurors could not reach a decision and requested additional instructions.    *Lowenfield*, 484 U.S. at 234.    The trial judge polled the jury and determined that 11 jurors believed that additional deliberations would help the jury reach a verdict; one juror disagreed.    *Lowenfield*, 484 U.S. at 234–35.    The trial judge then re-instructed the jury, telling the jurors that the court would impose a sentence of life imprisonment if they could not reach

---

422, 462 (1978) (italics in *U.S. Gypsum*).    Still later, in *Lowenfield*, the United States Supreme Court stated that its decision in *Jenkins* did not rest "on constitutional grounds" but on the Supreme Court's "supervisory power over the federal courts."    *Lowenfield*, 484 U.S. at 239 n.2.

a verdict.   The trial court stated that the jurors must "consult with one another to consider each other's views and [] discuss the evidence with the objective of reaching a just verdict if [they could] do so without violence to that individual judgment."  *Lowenfield*, 484 U.S. at 235.   Following this instruction, the jurors deliberated for 30 minutes and returned a verdict imposing the death penalty. *Lowenfield*, 484 U.S. at 235.

Though Mr. Lowenfield's attorney did not object to the polling or to the *Allen* instruction, on direct appeal, the Louisiana Supreme Court considered whether the trial court "impermissibly coerced the jury to return a sentence of death by inquiries it made to the jury and a supplemental charge."  *Lowenfield*, 484 U.S. at 233, 235–36.   The state supreme court rejected Mr. Lowenfield's argument "that the judge had coerced the sentence recommendations from the jury."  *Lowenfield*, 484 U.S. at 236.   In its review of the federal habeas proceedings in Mr. Lowenfield's case, the United States Supreme Court agreed with the state supreme court.

The United States Supreme Court explained that Mr. Lowenfield's argument "that the jury was improperly coerced requires that we consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'" *Lowenfield*, 484 U.S. at 237 (quoting *Jenkins*, 380 U.S. at 446).   Quoting *Allen*, the

48

Supreme Court noted that "'[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves.'" *Lowenfield*, 484 U.S. at 237 (quoting *Allen*, 164 U.S. at 501). The Supreme Court recognized that one of the purposes of an *Allen* charge is "the avoidance of the societal costs of a retrial." *Lowenfield*, 484 U.S. at 238. The Supreme Court found that the structure of the state's death penalty process "weigh[ed] in the constitutional calculus" and concluded that the fact that the trial court would have to impose a sentence of life imprisonment if the jury deadlocked did not preclude an *Allen* charge because, in a capital case, the State has "a strong interest in having the jury 'express the conscience of the community on the ultimate question of life or death.'" *Lowenfield*, 484 U.S. at 238 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968)).

The Supreme Court held that the charge in Mr. Lowenfield's case was less concerning than the charge in *Allen* because the trial court did not address the supplemental charge only to the jurors in the minority. *Lowenfield*, 484 U.S. at 237.[20] The Supreme Court observed in dicta that, even if the members of the jury

---

[20] In *Allen*, the Supreme Court summarized the relevant charge as follows:

> although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question

"had returned from . . . deliberations after only one hour and informed" the trial judge that they could not reach a unanimous decision "on the first ballot, the court would incontestably have had the authority to insist that they deliberate further." *Lowenfield*, 484 U.S. at 238. The Supreme Court continued: "This is true even in capital cases such as this one and *Allen,* even though we are naturally mindful in such cases that the 'qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.'" *Lowenfield*, 484 U.S. at 238–39 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)).

The Supreme Court stated that it was "mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion." *Lowenfield*, 484 U.S. at 240 (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 462 (1978)). The Supreme Court held that because "defense counsel did not object to either the polls or the supplemental

---

submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Allen*, 164 U.S. at 501.

instruction," the "omission indicate[d] that the potential for coercion . . . was not apparent to one on the spot." *Lowenfield*, 484 U.S. at 240.[21]  The Supreme Court concluded that, on the facts before it, "the combination of the polling of the jury" about the fruitfulness of continued deliberations and the *Allen* instruction were not "'coercive' in such a way as to deny [Mr. Lowenfield] any constitutional right." *Lowenfield*, 484 U.S. at 241.  The Supreme Court added:  "By so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion. Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."  *Lowenfield*, 484 U.S. at 241.[22]

---

[21] The dissenting justices provided context and observed that there were other potential explanations for Mr. Lowenfield's attorney's failure to object to the *Allen* charge.  *See* 484 U.S. at 246–256, 254 n.3.

[22] In a decision that is binding on this Court, the Fifth Circuit Court of Appeals stated that it had upheld the use of an *Allen* charge in a federal prosecution based on Supreme Court precedent, but the decision "was not an expression of our approval of the use of the Allen charge. Consequently, any variation from the classic Allen language will be subject to intense scrutiny. A charge will only survive this scrutiny if after examining the facts and circumstances, the court is convinced that the charge will not coerce the jury."  *United States v. Taylor*, 530 F.2d 49, 51 (5th Cir. 1976) (first citing *United States v. Cheramie*, 520 F.2d 325, 330 (1975); then citing *United States v. Amaya*, 509 F.2d 8, 12–13 (5th Cir. 1975); and then citing *United States v. Taylor*, 513 F.2d 70, 72 (5th Cir. 1975)); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting as binding precedent decisions of the Fifth Circuit entered on or before September 30, 1981).

Here, the trial judge began the penalty phase with a description of the penalty phase process and the statement: "we should be through today." (Doc. 40-12, p. 132). The jurors retired to deliberate at 3:05 p.m. that day. (Doc. 40-13, p. 119). When the trial court somehow learned that the jurors could not reach a verdict in the penalty phase, the judge brought the jurors into the courtroom at 4:25 p.m. that day and stated: "I do want to tell you that the Court cannot release you at this time, and I'm not going to release you at this time. You should make further efforts to arrive at a verdict." (Doc. 40-13, p. 120). The judge continued: "Each juror is entitled to his or her opinion of the evidence, but I know that you do not wish to put the State to the expense of another trial if it can be avoided. If you cannot reach a verdict, a mistrial would be declared, and the case would have to be tried again." (Doc. 40-13, p. 120). The judge also stated: "If possible, you should resolve any differences and come to a conclusion so that the case may be completed." (Doc. 40-13, p. 121). The judge offered to provide additional instructions on the law. (Doc. 40-13, p. 121). The judge concluded:

> What I've said to you must not be taken as an attempt on the part of the Court to require you to surrender your honest and reasonable convictions founded upon the law and the evidence in this case. My sole purpose is to impress upon your duty under your oath and the desirability and importance of reaching a verdict if you can conscientiously do so.

(Doc. 40-13, p. 121–22).

The trial judge did not expressly issue the ultimatum that the trial judge gave in *Jenkins*, but her remarks, viewed together and in context, conveyed a similar message.   The trial judge told the jurors the morning that the penalty phase began that she expected to complete the penalty phase that day, and when the trial judge somehow learned late in the afternoon that the jurors could not reach a decision, she told them that she could not release them, and she instructed them that they should try to arrive at a verdict so as to avoid additional expense to the State.   Unlike the trial judge in *Jenkins*, the trial judge in Mr. Maxwell's case included in her remarks language that indicated that jurors could maintain their convictions.   In this respect, the facts in this case are distinguishable from the facts in *Jenkins*.

Like Mr. Lowenfield, Mr. Maxwell depends on a combination of facts to argue that the trial judge's *Allen* charge was coercive.   Mr. Maxwell asserts that the charge was *sua sponte* and "inapplicable," contained inaccurate information concerning the consequence of a hung jury, and prompted a short period of deliberation before enough jurors changed their minds to return a 10-2 recommendation for the death penalty.   (Doc. 8, pp. 4, 71–73, 186–88).

The Alabama Court of Criminal Appeals found, generally, that "[i]n the context of the entire trial," the trial judge's instruction was not coercive because the judge did not use threatening language and did not suggest "what sentencing verdict should be returned." *Maxwell Direct*, 828 So. 2d at 365. To be sure, the trial judge did not instruct the jurors that they should recommend the death penalty, but she did tell the jurors that she was not able to release them, and she instructed them to continue deliberating and consider the fact that if they did not reach a verdict, "the case would have to be tried again." *Maxwell Direct*, 828 So. 2d at 364.

With respect to the trial judge's instruction regarding the costs of a retrial – "I know that you do not wish to put the State to the expense of another trial if it can be avoided" – the Court of Criminal Appeals reasoned that the instruction, though "not an entirely accurate statement of the law, was not so misleading as to constitute plain error." *Maxwell Direct*, 828 So. 2d at 366. This emphasis on the practical implications of a mistrial misunderstands the appellate court's obligation to measure the reliability of the jury's penalty phase verdict following the *Allen* charge. The Court of Criminal Appeals reasoned that, if the jury deadlocked in the sentencing phase, "only the sentencing phase of the trial would have to be retried," but "the time and expense of presenting the guilt phase again would be essentially the same" as

54

trying the entire case again because "the State, as well as the defense, would have to present all of the evidence from the guilt phase to a new sentencing jury." *Maxwell Direct*, 828 So. 2d at 366.

To evaluate the coercive impact of the trial court's *Allen* charge, the question before the Court of Criminal Appeals was not what judges and lawyers would understand about the practical ramifications of a mistrial but what jurors, uneducated in judicial procedure, would take from the trial judge's remarks and how the judge's remarks impacted the twelve jurors' deliberations. To assess the coercive impact of the trial court's *Allen* charge, a reviewing court must examine how the jury may have reacted to the message that, if they could not reach a penalty-phase verdict, in Mr. Maxwell's words, "the entire trial process, including the guilt phase, would be held for naught" – and the State of Alabama would incur the expense of a trial. (Doc. 40-14, p. 36). *Jenkins* and *Lowenfield* instruct that in assessing the possible "coercive effect" of the *Allen* instruction, a reviewing court must consider the entire record and "all the circumstances" in which the trial judge gave the *Allen* charge. *Jenkins*, 380 U.S. at 446; *Lowenfield*, 484 U.S. at 237.

*** 

55

Those circumstances begin with the statutory framework for Mr. Maxwell's sentencing hearing under Alabama law. Under Alabama law, in the sentencing phase, the jurors had to return a verdict recommending either death by electrocution or life imprisonment without eligibility for parole. (Doc. 40-13, pp. 104–05; *see* Doc. 40-12, pp. 138, 140). To recommend the death penalty, the jury had to vote at least 10 to 2 in favor of that penalty. (Doc. 40-13, pp. 115–16); *see* Ala. Code § 13A-5-46(f) ("The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors. The verdict of the jury must be in writing and must specify the vote.").[23] If more than two jurors declined to recommend the death penalty, then the sentencing recommendation was not automatically life imprisonment without parole as it would be other states that have a death penalty. Rather, under Alabama law, for the jury to recommend life imprisonment without

---

[23] In 2017, Alabama abolished the option of judicial override of jury recommendations in death penalty cases. The Alabama Court of Criminal Appeals has held that the current version of Ala. Code § 13A-5-46(f) is constitutional because the United States Supreme Court has not required a unanimous verdict to support a sentence. The Alabama Court of Criminal Appeals reads *Ramos v. Louisiana* to stand for the proposition that the Sixth Amendment right to a jury trial requires a unanimous verdict only to support a conviction, not a sentence. *Newton v. State*, 2024 WL 4312583, CR-2023-0953, at *28 (Ala. Crim. App. 2024) (first citing *Keaton v. State*, 375 So. 3d 44, 136–37 (Ala. Crim. App. 2021); and then citing *Ramos v. Louisiana*, 590 U.S. 83 (2020)). In *Ramos*, the United States Supreme Court held that the Sixth Amendment requires a unanimous verdict to support a conviction in state court. *Ramos*, 590 U.S. at 93. The Supreme Court stated that the Sixth Amendment affords a right to jury trial "as understood and applied at common law, … including all the essential elements as they were recognized in this country and England when the Constitution was adopted." *Ramos*, 590 U.S. at 92.

56

parole, "a majority of the jurors" had to vote for that recommendation, meaning that at least seven jurors had vote to recommend life imprisonment.    Ala. Code § 13A-5-46(f) ("The decision of the jury to return a verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors."); (Doc. 40-13, p. 116).[24]    Structurally then, under Alabama law, jurors do not have to agree unanimously to recommend the death penalty, and the gap between two votes for life imprisonment and seven votes for life imprisonment left significant

---

[24] Nationally, § 13A-5-46(f) is an outlier because the statute permits the imposition of the death penalty without requiring a unanimous verdict as to that sentence, and the statute does not by default impose a sentence of life imprisonment if the jury does not agree by at least a vote of 10-2 to impose the death penalty.    In most states, if a jury does not unanimously determine that death is the appropriate sentence, then the defendant is automatically sentenced to life imprisonment.    *See, e.g.,* ARK. CODE § 5-4-603(a), (c); COLO. REV. STAT. § 18-1.3-1201(2); GA. CODE § 17-10-31(a); KAN. STAT. § 21-6617 (e); MISS. CODE § 99-19-103; 21 OKLA. STAT. § 701.11; WYO. STAT. § 6-2-102(d)(ii).    In other states, if a jury does not unanimously determine that death is the appropriate sentence but also does not unanimously determine that life imprisonment is the appropriate sentence, then the jury is dismissed, and the court impanels a new jury to determine the appropriate sentence.    *See, e.g.,* NEV. REV. STAT. § 175.556(1); ARIZ. REV. STAT. § 13-752.    In some states, if the first jury does not reach a verdict, courts have discretion to impanel another jury or sentence the defendant to life imprisonment.    *See, e.g.*, NEV. REV. STAT. § 175.556(1).    Florida's current death penalty legislation most closely resembles Alabama's death penalty structure.    In 2023, Florida amended its statute to provide that a jury could make a recommendation of death if eight jurors agree to impose the death penalty.    FLA. STAT. § 921.141(3)(a)(2).

Mr. Maxwell contends that he has a Sixth Amendment right to a unanimous verdict in the penalty phase of his case, (Doc. 8, p. 74), but he has not cited a United States Supreme Court decision requiring a unanimous penalty-phase decision.

57

room for the *Maxwell* jury – and for any jury in an Alabama capital case – to deadlock in the sentencing phase.

Layered on this structural circumstance is the fact that under Alabama law, the trial judge's instruction that, "If you cannot reach a verdict, a mistrial would be declared, and the case would have to be tried again," was contrary to Alabama law. Under the version of Alabama Code § 13A-5-46(g) in effect in 1998, if a jury was "unable to reach a verdict recommending a sentence," then the trial court could "declare a mistrial of the sentence hearing." Ala. Code § 13A-5-46(g) (1975).[25] Then, as now, § 13A-5-46(g) stated: "Such a mistrial shall not affect the conviction." Ala. Code § 13A-5-46(g). In 1998, following a sentencing phase mistrial, if a new sentencing trial was held, § 13A-5-46(g) provided that the second sentencing trial would be "conducted before another jury, selected according to the laws and rules governing the selection of a jury for the trial of a capital case" and added that "after one or more mistrials both parties with the consent of the court

---

[25] In 1998, § 13A-5-46(g) referred to "an advisory verdict" rather than "a verdict" in a sentencing hearing. A trial judge could accept or reject an advisory verdict. *See, e.g. Lockhart v. State*, 163 So. 3d 1088, 1135–38 (Ala. Crim. App. 2013) (upholding "judicial override" of a jury's unanimous recommendation for life imprisonment). The Alabama Legislature substituted the word "a" for the phrase "an advisory" in 2017. Act 2017-131, p. 173, § 1. Currently, § 13A-5-46(g) states in relevant part: "If the jury is unable to reach a verdict recommending a sentence, or for other manifest necessity, the trial court may declare a mistrial of the sentence hearing. Such a mistrial shall not affect the conviction." Ala. Code § 13A-5-46(g) (1975).

[could] waive the right to have a verdict from a jury, in which event the issue of sentence [would] be submitted to the trial court without a recommendation from a jury." Ala. Code § 13A-5-46(g); *see also* Ala. Code § 13A-5-44(c). Thus, in the event of a mistrial in the penalty phase of Mr. Maxwell's case, there was no basis under Alabama law for another jury to have to decide the issue of guilt or innocence, and a mistrial in the sentencing phase might not require a new sentencing hearing because § 13A-5-46(g) permitted the parties, after one penalty phase mistrial, to waive a jury recommendation for sentencing – a recommendation that was only advisory in 1998. Thus, the trial court's statement in the penalty-phase *Allen* charge that a mistrial in that phase would cause "the case [to] have to be tried again" was completely at odds with Alabama law.

The error is exacerbated by the additional circumstance that the guilt-phase of Mr. Maxwell's trial lasted three days, the penalty phase lasted one day, and the guilt-phase evidence included Mr. Maxwell's recorded statement in which he provided "a detailed statement admitting his involvement" in the murder of the Pughs and the bank robbery. *Maxwell Direct*, 828 So. 2d at 352; (Doc. 40-8, pp. 36, 41, 114; Doc. 40-12, p. 132) (reflecting that the guilt-phase began on May 11, and the penalty phase began and ended on May 14). The State relied on the contents of Mr.

Maxwell's statement to prove his participation in the robbery and the murders. (Doc. 40, pp. 22–40). Mr. Maxwell's involvement in the robbery was the only aggravating circumstance that the State had to prove in the penalty phase of Mr. Maxwell's case. (Doc. 40, p. 46; Doc. 40-13, pp. 109–10). In his statement, Mr. Maxwell identified himself as "second in command" and confessed to the bank robbery and to shooting Mr. Pugh and his son. *Maxwell Direct*, 828 So. 2d at 352; *see also* (Doc. 40, pp. 23–40).

With this evidence in hand, the jury returned a unanimous guilt-phase verdict in approximately 40 minutes. (Doc. 40-12, pp. 128–29) (time notations relating to jurors' deliberations).[26] Given this evidence, the jurors had every reason to be confident in their guilt-phase verdict, and the trial court's remark – "I know that you do not wish to put the State to the expense of another trial if it can be avoided" – followed by – "If you cannot reach a verdict, a mistrial would be declared, and the case would have to be tried again" – pressured the jury to reach a verdict in the

---

[26] On May 13, in the guilt phase of Mr. Maxwell's trial, the jury retired to the jury room to deliberate at 5:20 p.m. (Doc. 40-12, p. 128). The trial court had not provided the exhibits to the jury at that time, and the jury did not have a tape recorder in the jury room to listen to Mr. Maxwell's taped statement again. At 6:05 p.m., the jury knocked to indicate that it had a verdict. (Doc. 40-12, p. 129; *see also* Doc. 40, p. 19). Assuming the jurors waited a few minutes to receive the exhibits to begin deliberating, their substantive deliberations took no more than 40 minutes.

penalty phase so as to avoid another three-day guilt-phase trial for a confessed murderer.

An instruction that was correct under Alabama law would have indicated that a hung jury in the penalty phase could lead to a new sentencing hearing that would not impact the jury's finding of guilt from the guilt phase of the trial. The trial judge instructed jurors that the penalty-phase aggravating circumstance that they could consider was whether "[t]he capital offense was committed while the defendant was engaged in or was an accomplice in . . . [a] robbery." (Doc. 40-13, pp. 109–10). Because Mr. Maxwell confessed to the murders and related robbery, jurors properly instructed about a possible new sentencing hearing likely would conclude that a new sentencing hearing would last approximately one day because Mr. Maxwell admitted to the aggravating circumstance in his confession, and Mr. Maxwell's mitigating evidence occupied only a few hours. Jurors receiving a correct instruction under Alabama law would have felt significantly less pressure to avoid an impasse in the penalty phase.[27]

---

[27] In 1998, jurors in Alabama were not instructed that their verdict was only advisory. (*See* Doc. 40, p. 47).

The record indicates that jurors may have been reluctant to cause another jury to have to try the guilt phase not only because of the expense of a retrial but also because of the emotional toll of trying a capital case. In her closing remarks to the jury after the jury announced its penalty-phase verdict, the trial judge stated: "I just know that this has been a very difficult week and a difficult task for you. And there's nothing that I can say, and there's nothing that I could have said Monday to make it any easier for you, and I just appreciate you serving." (Doc. 40-13, p. 124). Jurors, having invested three days in hearing the guilt-phase evidence and having reached a unanimous verdict as to guilt, likely did not want their verdict of guilty disturbed and may have believed that they were saving another jury from having to do that work.[28]

Layer on that another circumstance – the time during which the jury deliberated. *Lowenfield*, 484 U.S. at 240. As noted, the jury returned its guilt-phase verdict in approximately 40 minutes. The trial judge informed the jury at the start of the penalty phase that the phase "should be through today." (Doc. 40-12,

---

[28] The trial judge's comment at the beginning of the penalty phase that the case "should be" done that day may have stemmed from the judge's concern for the jurors and an appreciation that the jurors wanted to complete their service in Mr. Maxwell's case.

62

p. 132).[29]   The jurors received the case to begin deliberating the same afternoon at 3:05 p.m.   (Doc. 40-13, p. 119).   When the jurors notified the trial judge at 4:30 p.m. that they could not reach a verdict, the jury had been deliberating for twice as long as the jury had deliberated in the guilt phase to reach a unanimous verdict. (Doc. 40-13, pp. 119–20).

The jury's deadlock in the penalty phase indicated that more than two and fewer than seven jurors had voted to recommend a sentence of life imprisonment without the possibility of parole.   Because Mr. Maxwell's admission in his statement to police that he was involved in the bank robbery and murders established the aggravating circumstance, it is likely that jurors' disagreements concerned the mitigating evidence in the penalty phase.   Indeed, when the jurors returned to deliberate after the trial judge gave the *Allen* charge, the jurors asked for the transcript of the deposition of Dr. Crowder, a mitigation witness.   (Doc. 40-13, pp. 122–23).   The trial judge had instructed the jurors that they should not consider mitigating evidence if they did not first find, unanimously, the presence of an aggravating circumstance.   (Doc. 40-13, p. 110) (instructing the jury that "before

---

[29] *See Amaya*, 509 F.2d at 10–11 (reversing judgment and remanding for new trial in part because the trial judge's instructions, following a deadlock, were coercive because the instructions indicated that the trial judge "was anxious to conclude the lawsuit").

you can even consider recommending that the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt that at least one aggravating circumstance exists"); (Doc. 40-13, p. 111) (instructing the jury that "If you find no aggravating circumstances have been proven beyond a reasonable doubt to exist in this case, then you must return a verdict recommending that the defendant's punishment be life imprisonment without parole.   In that case[,] . . . you need not concern yourself with mitigating circumstances in this case").[30]   With only mitigating circumstances left to decide in the penalty phase when the trial judge gave the *Allen* charge, the jury would have felt even more compelled to reach a sentencing phase verdict, given the judge's instruction that if the jury failed to reach a sentencing-phase verdict, the trial process would have to start again from the beginning.   Though the record does not clearly support Mr. Maxwell's contention that the jury returned its sentencing phase verdict 15 minutes after the trial court gave the *Allen* charge, the record indicates that the jurors deliberated at most for 90 minutes after the *Allen* charge, only to return a less-than-unanimous verdict.

---

[30] Having found, unanimously, in the guilt phase that Mr. Maxwell was guilty of counts one and two, (Doc. 40-1, pp. 34–35), the counts alleging that Mr. Maxwell shot the Pughs during a first degree robbery, (Doc. 40, p. 170), it was all but certain that the jury in the penalty phase would find, unanimously, an aggravating circumstance.

64

That 10-2 verdict is another circumstance relevant to Mr. Maxwell's assertion that the jury's death penalty recommendation was coerced.    The trial judge explained to the jury that, "to bring back a verdict recommending the punishment of death, at least ten of your number must vote for death."    (Doc. 40-13, p. 115).    The trial judge reiterated that "[a]ny number less than ten cannot recommend the death penalty," and stated that a "verdict for death" could be "ten for death and two for life without parole."    (Doc. 40-13, pp. 115–16).    This instruction, coupled with the *Allen* instruction, communicated to the jury that two jurors could hold fast to their convictions regarding the mitigating evidence, and the jury still could avoid a mistrial that would cause the State to incur the time and expense of having to try the case again.

Finally, there is the circumstances of the incorporation of the financial interests of the State into the penalty phase instructions.    Courts uniformly prohibit jurors from receiving information about the expenses associated with capital cases because the information is irrelevant and prejudicial.    *State v. Hayes*, No. CR070241859, 2010 WL 4353735 at *1–2 (Conn. Super. Oct. 14, 2010) (collecting cases and stating that "[a] jury in the penalty phase of a capital case is charged with the task of using reasoned moral judgment, not counting dollars and cents"); *c.f.*

65

*Brooks v. Kemp,* 762 F.2d 1383, 1412 (11th Cir. 1985) (en banc) (stating that it was "clearly improper" for a prosecutor "to argue that death should be imposed because it is cheaper than life imprisonment"), *vacated on other grounds*, 478 U.S. 1016 (1986).

In *United States v. Rey*, the Eleventh Circuit Court of Appeals stated that the "practical effect" of an instruction that "another trial would only serve to increase the costs to both sides" was "to discourage jurors in the minority and to pressure them to abandon their honestly held beliefs, not in response to considerations regarding the guilt or innocence of the defendant, but in response to the expediency of saving expenses." 811 F.2d 1453, 1459 (11th Cir. 1987) (emphasis omitted).

The *Allen* instruction in Mr. Maxwell's case is more likely to coerce a verdict than the instruction in *Rey* because the instruction here is one-sided; it addresses only the State's financial concerns. (Doc. 40-13, p. 120) ("I know that you do not wish to put the State to the expense of another trial if it can be avoided."). Jurors, as taxpayers, have a vested interest in state finances.[31] One-sided language in an *Allen*

---

[31] *See Thaggard v. United States*, 354 F.2d 735, 740 (5th Cir. 1965) (Coleman, J. specially concurring) ("Certainly, all trials are expensive. The Government knows this when the prosecution is begun. To me, expense is never a consideration either to be mentioned or entertained in the dispensation of justice. In these days of ever increasing governmental costs, it requires no wild flight of the imagination to note what an ordinary juror thinks about the expenses of the government or how a reminder of expenses will likely affect his reasoning and reactions.").

charge is widely viewed as problematic.  *See United States v. Hill*, 417 F.2d 279, 280 (5th Cir. 1969) ("This court, although sometimes reluctantly, has approved the 'Allen' charge, while carefully assuring ourselves that there are not engrafted upon it any partial or one-sided comments."); *United States v. Amaya*, 509 F.2d 8, 13 (5th Cir. 1975) (same); *see also United States v. Pruitt*, 843 Fed. Appx. 231, 233–34 (11th Cir. 2021) (finding that language in the Eleventh Circuit's modified pattern *Allen* charge relating to the expense of retrial is not coercive in part because the language is "not partial or one-sided").[32]

In holding that the trial judge's misstatement of Alabama law regarding a retrial was not significant because the expense of a retrial of the penalty phase could be similar to the expense of the entire first trial, the Alabama Court of Criminal Appeals stopped short of assessing the coercive impact of the trial court's instruction that jurors should try to reach a verdict to save the State money and failed to account for the one-sided focus on the State's financial resources.

***

---

[32] 11th Cir. Pattern Jury Instruction T5 ("This is an important case. The trial has been expensive in time, effort, money, and emotional strain to both the defense and the prosecution. If you fail to agree on a verdict, the case will be left open and may have to be tried again. Another trial would increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side any better or more exhaustively than it has been tried before you.").

This is the combination of circumstances that should have been considered in evaluating the coercive impact of the trial judge's *Allen* charge.   The Alabama Court of Criminal Appeals did not engage in the analysis that the United States Supreme Court required in *Lowenfield*.  *Lowenfield*, 484 U.S. at 237 (requiring courts to consider an *Allen* charge "in its context and under all the circumstances") (quoting *Jenkins*, 380 U.S. at 446).   In *Amaya*, a decision that is binding precedent, the Fifth Circuit Court of Appeals stated:   "Where a charge may be plausibly read as more coercive than the standard charge we must hold that the charge was incorrectly given."   *Amaya*, 509 F.2d at 13.   The Court of Appeals added:

> We will sanction soothing and purgative additions, but any verbal gilding which may plausibly be read as coercive must be disapproved. We must remain ready to prevent a concentrated coercive charge from judicially catalyzing a surrender of beliefs. We must be as certain as physically possible that the conjunction of time and words is not coercive.

*Amaya*, 509 F.2d at 13.[33]   Here, the combination of the incorrect language in the charge that indicated that a penalty-phase impasse would require a new trial of the

---

[33] In *Amaya*, the trial court instructed the jury:

> Now, I don't want the record to reflect nor do I want anybody to know how you stand with reference to your deliberations in this case. Now you have asked for additional instructions and additional definitions which I have given you. And I know that you are trying very hard to discharge your responsibilities as jurors in a

68

very conscientious manner. But as you know, this has been an expensive trial both from the standpoint of the Government and from the standpoint of you as taxpayers and as jurors, officers of this Court and as triers of the facts. And also it's a trying experience for the parties.

Now I stand ready at any time if you request it to charge you additionally as to the law or give you any other instructions that might be helpful to you. I have made the charge on the law in this case as simple as the applicable law would permit me to give it to you. I charge you additionally at this time that this is a most important case both from the standpoint of the Defendant and of the Government. But all trials are exceedingly expensive.

Your failure to agree upon a verdict will necessitate another trial equally as expensive. This Court is of the opinion that this case cannot be again tried better or more exhaustively than it has been by either side in the case. It is therefore very desirable from the standpoint of all the parties and everyone interested in this case that you do reach a verdict. This Court does not desire that any juror should surrender his or her conscientious convictions. On the other hand, each juror shall perform his or her duty conscientiously and honestly according to the law in this case and according to the evidence in this case.

Although the verdict to which a jury agrees must of course be his or her own verdict, the result of his or her own convictions and not a mere acquiescence to the conclusions of your fellow jurors, yet in order to bring 12 minds to a unanimous result, you jurors must examine the question submitted to you with candor and with proper regard and deference to the opinions of the other members of your jury. You should consider that this case must at some time be decided by somebody and by some jury in a position which you now find yourselves. You were selected in the same manner and from the same source from which any future jury must be selected. And there is no reason to suppose that this case will ever be submitted to a more intelligent or impartial or more competent jury to decide it or that clear evidence will be produced on one side or the other.

In conferring together, you ought to pay proper respect to each other's opinions with the disposition to be convinced by each other's arguments. And on the other hand, if the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one which makes no impression upon the minds of so many equally honest, equally intelligent with that juror who has heard the same evidence and with the same attention and with the same equal desire to arrive at the truth on the matter and under the sanctity of the same oath.

guilt and penalty phases, the one-sided language in the charge that focused on the

expense of an entire new trial to the State, the structure of Alabama's statute that

permitted two jurors to maintain their conviction that Mr. Maxwell should not

receive the death penalty, and the trial judge's communication of the expectation

that the penalty phase would begin and end in one day made the *Allen* charge in Mr.

---

> On the other hand, if a majority are for acquittal, the minority ought to seriously ask themselves whether they may not be reasonable and may not reasonably and ought not to doubt the correctness of a judgment which is not concurred in by most of those with whom they are associated on this jury and distrust the weight or sufficiency of the evidence which fails to carry a conviction in the minds of your fellow jurors.
>
> Now with this additional charge, and I cannot in view of the slight—I don't consider your deliberations at all lengthy at this time. I think that there is a possibility that the jurors have and usually do if given an opportunity on sober reflection arrive at a verdict. So I'm going to excuse you for the day and ask you to come back in the morning. I'm going to give you an opportunity to—you have deliberated from 9:15 today and you deliberated for about 30 minutes yesterday. But we had one jury deliberate under circumstances such as you have expressed here to me for over nine days and they finally reached a verdict. So I'm going to give you an opportunity to reach a verdict. I'm going to ask you now—your deliberations are important. I want to give you an opportunity on sober reflection to return to your residences. Do not discuss this case with anybody, among yourselves, away from this Courtroom. Don't discuss it with any member of your family. Do not read, by all means, anything about this case in the newspaper. You have my instructions on that. Follow the instructions I have given you. Do not listen to it on the radio or watch it on television. And I expect you to be back in the morning at 9:15 to do your best to resolve your differences. Re-examine the position that each of you have taken and commence your deliberations at 9:15.

*Amaya*, 509 F.2d at 9 n.2.    The Court of Appeals held that the "nuances" in the charge that deviated from the standard *Allen* charge, particularly the emphasis on time, were "beyond the allowable perimeters of jury instruction."    509 F.2d at 12.

70

Maxwell's case impermissibly coercive and, therefore, unconstitutional and incorrectly given.[34]

That conclusion, though, does not mean that Mr. Maxwell is entitled to relief. As discussed, under AEDPA, to obtain relief, Mr. Maxwell must demonstrate that the Court of Criminal Appeals' application of Supreme Court precedent was objectively unreasonable. In *Wong v. Smith*, Justice Alito, dissenting from the denial of a writ of certiorari, wrote that the "clearly established law" regarding the analysis of the arguably coercive impact of a particular *Allen* charge "is sparse." 562 U.S. 1021, 1023 (2010) (Alito, J., dissenting). Justice Alito stated: "Just one of this Court's decisions, *Lowenfield v. Phelps,* 484 U.S. 231 (1988), has addressed the constitutional rule against coercive jury instructions. And *Lowenfield* held only that, on the totality of the circumstances present there, no unconstitutional coercion resulted." 562 U.S. at 1023. He added:

> As a result, the clearly established law in this area provides very little
> specific guidance. About all that can be said is that coercive
> instructions are unconstitutional, coerciveness must be judged on the
> totality of the circumstances, and the facts of *Lowenfield* (polling a

---

[34] The absence of a record of the jury's communication with the state trial court concerning the status of their deliberations and the trial court's apparent lack of communication with the parties' attorneys before the jury returned to the courtroom and received the *sua sponte Allen* charge also are problematic. The Court does not suggest that there was wrongdoing, but the Court's analysis is hamstrung by the gaps in the trial court record.

71

> deadlocked jury and reading a slightly modified *Allen* charge) were not unconstitutionally coercive.   *See* 484 U.S., at 237–241.
>
> A general standard such as this gives state courts wide latitude for reasonable decisionmaking under AEDPA.

562 U.S. at 1023.   The totality of the circumstances here are unlike those in *Lowenfield*, and the binding decisions that cause this Court to conclude that the *Allen* instruction in this case is coercive and unconstitutional are not Supreme Court decisions.   Moreover, as noted, if "'fairminded jurists could disagree' on the correctness of the state court's decision," then habeas relief under AEDPA's unreasonable application clause is not available.   *Harrington*, 562 U.S. at 101.

Given the lack of Supreme Court precedent setting parameters for the types and combinations of circumstances that warrant a finding of coerciveness, this Court is hard-pressed to say that the Court of Criminal Appeals' application of Supreme Court precedent as of 2000 was unreasonable under AEDPA.   Given the lack of Supreme Court precedent, jurists also could disagree on the correctness of the state court decision.   Therefore, while the record in Mr. Maxwell's case convinces this Court that the Court of Criminal Appeals incorrectly determined that the trial court's penalty-phase *Allen* charge was not unduly coercive, Mr. Maxwell is not entitled to relief under AEDPA based on the coercive *Allen* charge.

72

***

*Ineffective Assistance of Counsel and Procedural Default*

Mr. Maxwell's other challenges to his conviction and sentence focus on the work his attorneys did at the trial and appellate levels. Mr. Maxwell contends that errors committed by his trial and appellate attorneys rendered their representation ineffective. Warden Raybon argues that procedural deficiencies bar habeas relief on many of Mr. Maxwell's remaining claims. The Court discusses these principles before turning to the parties' specific arguments.

**A.**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the standard for evaluating the effectiveness of counsel. To prove that a conviction or sentence is unconstitutional due to ineffective assistance of counsel, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the

73

Sixth Amendment."    466 U.S. at 687.    "Second, the defendant must show that the deficient performance prejudiced the defense."    466 U.S. at 687.    "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687.    "[B]oth showings" are necessary for a petitioner to establish ineffective assistance—"a breakdown in the adversary process that renders the [conviction or sentence] unreliable."    466 U.S. at 687.    A court "need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa."    *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted).

A petitioner must establish *Strickland*'s first prong "by a preponderance of competent evidence."    *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc).    To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.    "[P]revailing professional norms" are the benchmarks for judging reasonableness.    466 U.S. at 688.    When assessing this prong, courts must be "highly deferential" in the "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."    466 U.S. at 689.

74

Under the *Strickland* framework, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). The Supreme Court has observed that "countless ways [of] . . . effective assistance [exist] in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689. The Supreme Court has noted that "[i]t is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or [an] adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689. Consequently, a reviewing court must "eliminate the distorting effects of hindsight, . . . reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time" of representation. 466 U.S. at 689; *see also, e.g.*, *Newland v. Hall,* 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689).

75

When a habeas court reviews an ineffective assistance of counsel claim that state courts resolved on the merits, "[i]n addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference." *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (alteration in *Williams*) (internal quotation marks omitted) (quoting *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004)).    Therefore, a petitioner not only must "satisfy the elements of the *Strickland* standard," but he also must demonstrate that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Williams*, 598 F.3d at 789 (cleaned up) (emphasis omitted).   Because *Strickland* and § 2254(d) incorporate "'highly deferential' [standards], . . . when the two apply in tandem, review is 'doubly' so."   *Richter*, 562 U.S. at 105 (citations omitted). Under AEDPA, a court must determine "whether there is any reasonable argument" that defense counsel's performance satisfied *Strickland*'s objective standard of reasonableness.   *Richter*, 562 U.S. at 101, 105.   Because of this "[d]ouble deference," it "will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."   *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012) (internal quotation marks omitted).

76

To satisfy the prejudice component, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is [one] sufficient to undermine confidence in the outcome." 466 U.S. at 694. "A finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict . . . suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (internal quotation marks omitted). The fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. Additionally, if the state court has rejected the prejudice prong on the merits, then, per AEDPA deference, a petitioner must demonstrate that the state court ruling is unreasonable. *See Cullen v. Pinholster*, 563 U.S. 170, 197–98 (2011) ("Even if his trial counsel had performed deficiently, [the petitioner] also has failed to show that the [state court] must have unreasonably concluded that [he] was not prejudiced.").

The test for evaluating penalty-phase prejudice under *Strickland* is distinct from the test for evaluating prejudice in the guilt phase of a capital case. In the penalty phase, "the [constitutional] question is whether there is a reasonable

77

probability that, absent the [attorney] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Stewart v. Sec'y, Fla. Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (alterations added) (quoting *Strickland*, 466 U.S. at 695).

**B.**

Alabama state courts often reject *Strickland* claims without an evidentiary hearing because of Rule 32 pleading deficiencies. For example, Rule 32.3 of the Alabama Rules of Criminal Procedure places "the burden of pleading . . . the facts necessary [for] . . . relief" on the petitioner. Ala. R. Crim. P. 32.3. Rule 32.6(b) obligates a petitioner to state a postconviction claim "clear[ly] and specific[ally]" and "includ[e] a full disclosure" of a claim's factual basis. Ala. R. Crim. P. 32.6(b). Rule 32.7(d) authorizes summary disposition of challenges that lack "sufficient[]" specific[ity]," concern "precluded" matters, state an incognizable claim, or contain "no material issue of fact or law . . . entitl[ing] the petitioner to relief." Ala. R. Crim. P. 32.7(d).

When Alabama courts deny a constitutional claim based on these state procedural rules, a reviewing federal court should treat that decision as merits-based under AEDPA. *See, e.g.*, *Borden v. Allen*, 646 F.3d 785, 812 (11th Cir. 2011) ("A

78

ruling by an Alabama court under Rule 32.6(b) is also a ruling on the merits.”); *Frazier v. Bouchard*, 661 F.3d 519, 524 (11th Cir. 2011) (concluding that § 2254(d) applies when reviewing a Rule 32.7(d) dismissal based on a claim’s lack of specificity under Rule 32.6(b)).

The Eleventh Circuit Court of Appeals’ decision in *Daniel v. Comm’r, Ala. Dep’t of Corr.*, 822 F.3d 1248 (11th Cir. 2016), provides guidance for resolving federal habeas arguments which a state court rejected under Rule 32 based on inadequate pleading.   A federal court first must consider whether the petitioner presented “enough specific facts that, if proven, amount[ed] to a valid [guilt or] penalty phase ineffective assistance of counsel claim.”   822 F.3d at 1261.   The Eleventh Circuit explained that courts must be “mindful that ‘at the pleading stage of Rule 32 proceedings [in Alabama], a Rule 32 petitioner does not have the burden of proving his claims,’” and that facts a petitioner asserts in a Rule 32 petition “are assumed to be true under Alabama law.’”   822 F.3d at 1262 (quoting *Ford v. State,* 831 So. 2d 641, 644 (Ala. Crim. App. 2001)) (citing *Ex parte Williams,* 651 So. 2d 569, 572–73 (Ala. 1992)).   “[T]o meet the pleading requirements of Rule 32.6(b),” a petitioner must:

> identify the specific acts or omissions of counsel that are alleged not to
> have been the result of reasonable professional judgment ... [and] plead

79

> specific facts indicating that [the petitioner] was prejudiced by the acts or omissions, i.e., facts indicating that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.

822 F.3d at 1261 (citations omitted). If a federal court finds that the petitioner adequately pleaded his constitutional challenge in his Rule 32 petition, then the federal court must determine "whether the [appellate] decision to the contrary was unreasonable under § 2254(d)." 822 F.3d at 1261.

## C.

For the Court to reach the merits of Mr. Maxwell's *Strickland* claims, absent limited exceptions, Mr. Maxwell must have exhausted his administrative remedies. 28 U.S.C. § 2254(b)(1)(A); *Cullen*, 563 U.S. at 182. Exhaustion requires petitioners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the [s]tate's established appellate review process." *Pruitt v. Jones*, 348 F.3d 1355, 1358 (11th Cir. 2003) (alteration added) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)); *see Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (stating that before presenting a federal constitutional argument in a federal habeas petition for a federal court's

consideration, a petitioner "must have raised these claims in state court to allow the state courts the opportunity to rule on the federal issues.").

A "full opportunity" for state appellate review "includ[es] review by the state's court of last resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d at 1358–59. "Alabama's discretionary direct review procedures bring Alabama prisoner [Rule 32] petitions within the scope of the *Boerckel* rule." *Pruitt*, 348 F.3d at 1359 (internal quotation marks omitted) (quoting *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001)); *see Pruitt*, 348 F.3d at 1359 (concluding that the petitioner did not exhaust his state remedies because he did not petition the Alabama Supreme Court for discretionary review of the dismissal of his Rule 32 petition).

To satisfy the exhaustion requirement, "the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). Rather, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was

presented in state court." *Pope v. Sec'y for the Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alteration in *Pope*) (quoting *Kelley v. Sec'y, Fla. Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). "A failure to exhaust occurs . . . when a petitioner has not 'fairly present[ed]' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Pope*, 680 F.3d at 1284 (quoting *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (per curiam)).

Procedural default is a doctrine separate from but related to the principle of exhaustion. When a petitioner seeks habeas relief based on an unexhausted federal claim, "if it is clear from state law that any future attempts at exhaustion would be futile" under the state's procedural framework, then a "federal court[] may treat [that] unexhausted claim[] as procedurally defaulted." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (per curiam) (citing *Snowden*, 135 F.3d at 737). Procedural default applies to federal constitutional challenges that a petitioner only partially exhausted in state court.

Procedural default also occurs when a petitioner presents a federal claim to a state court but does not "comply with all 'independent and adequate' state procedures." *Mason*, 605 F.3d at 1119 (quoting *Wainwright v. Sykes*, 433 U.S. 72,

82

87 (1977)).   Under this type of procedural default, a "'state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim,'" if "the state procedural ruling rests upon 'adequate and independent' state grounds," *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citing *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995)).

The Eleventh Circuit uses a three-part test "to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).   "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim."   *Judd*, 250 F.3d at 1313. "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law."   *Ward*, 592 F.3d at 1156–57 (citing *Judd*, 250 F.3d at 1313).   "Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'"   *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

83

When a state criminal defendant's constitutional challenge to his conviction and sentence is procedurally defaulted either pursuant to the exhaustion doctrine or "pursuant to an independent and adequate state procedural rule," he may overcome procedural default in a federal habeas proceeding by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."   *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Murray v. Carrier*, 477 U.S. 478, 495–97 (1986); *Bailey*, 172 F.3d at 1306 (applying the "cause and prejudice" standard as the burden to meet to overcome any type of procedural default).

To show cause, a petitioner must prove that an "objective factor external to the defense impeded" his attorney's effort to pursue his federal constitutional challenge properly under state court procedures.   *Murray*, 477 U.S. at 488; *see also id.* at 492 (stating that "cause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim").   A petitioner may demonstrate that "interference by officials . . . ma[de] compliance with the [s]tate's procedural rule impracticable" or "show[] that the factual or legal basis for a claim was not reasonably available to counsel" or

84

attribute the procedural error to ineffective assistance of counsel.    *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (some alterations added) (internal quotation marks omitted) (quoting *Murray*, 477 U.S. at 488), *superseded on other grounds by statute as stated in Banister v. Davis*, 590 U.S. 504, 514 (2020).

To establish prejudice, a habeas petitioner must demonstrate "actual prejudice resulting from the alleged constitutional violation."    *Ward*, 592 F.3d at 1157.    The petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."    *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

To establish a fundamental miscarriage of justice concerning a defaulted claim, a petitioner must demonstrate his actual innocence.    *Schlup v. Delo*, 513 U.S. 298, 324 (1995).    In *Schulp*, the Supreme Court held that a capital petitioner may excuse procedural default if the trial evidence and new evidence make it "more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt."    *Schulp*, 513 U.S at 327.

***

85

Warden Raybon argues that several of Mr. Maxwell's ineffective assistance claims are unexhausted and procedurally defaulted because Mr. Maxwell did not raise or adequately plead the issues in his Rule 32 proceedings.    (*See, e.g.*, Doc. 41, pp. 33–37; Doc. 40-17, pp. 3–78; Doc. 14-16, pp. 12–13).

Shortly after a state trial judge summarily dismissed Mr. Maxwell's *pro se* Rule 32 petition, an attorney appeared for Mr. Maxwell and requested permission to file an amended Rule 32 petition that included arguments concerning the effectiveness of Mr. Maxell's attorneys on direct appeal.    (Doc. 40-16, p. 131; Doc. 14-7, pp. 71–73).    The new attorney also asked the trial court to reconsider the dismissal of Mr. Maxwell's *pro se* Rule 32 petition.    (Doc. 40-16, pp. 105–30). The trial court denied Mr. Maxwell's motion to reconsider the dismissal of his *pro se* petition, (Doc. 40-17, p. 106), and the trial court did not rule on his motion to amend his Rule 32 petition, (Doc. 40-16, pp. 3–5).

When he appealed the trial court's summary dismissal of his *pro se* Rule 32 petition, Mr. Maxwell did not include in his appellate brief his specific challenges to the effectiveness of his attorneys.    (*See* Doc. 40-18, pp. 2–90).    Instead, Mr. Maxell argued that "the trial court denied his right to due process when it granted the State's motion to dismiss without first affording him the opportunity to respond

to the State's answer and motion to dismiss and to amend his petition."    (Doc. 47, p. 56) (internal quotation marks omitted); (*see* Doc. 40-17, p. 111, Doc. 40-20, pp. 104–05, 136–37).    This due process argument did not alert the Alabama Court of Criminal Appeals to Mr. Maxwell's specific arguments concerning the alleged constitutional deficiencies in the performance of his attorneys, so Mr. Maxwell's ineffective assistance of counsel arguments are not exhausted, and the arguments are procedurally defaulted.

To overcome procedural default, Mr. Maxwell argues that there was cause for his default and that he has been prejudiced by the default.    He argues, as he did in the Court of Criminal Appeals, that he is entitled to a merits review of all of the grounds in his amended Rule 32 petition because the summary dismissal of his *pro se* Rule 32 petition violated his right to due process.    (Doc. 47, pp. 36, 49–59; *see also* Doc. 8, pp. 24–25).    Mr. Maxwell notes that he did not have an automatic right to appointed counsel for his Rule 32 petition, so he filed a *pro se* Rule 32 petition and asked the state trial court to appoint counsel to represent him.    (Doc. 47, p. 53). Mr. Maxwell argues that the state court "failed to appoint counsel," and, after his *pro se* Rule 32 petition and his motion to appoint counsel had been "pending for 20 months, seemingly without any judge being assigned to decide it," the State moved

87

to dismiss his *pro se* petition, and, five days later, a newly-assigned state trial judge signed, "without alteration," the proposed dismissal order the State provided to the trial court.    (Doc. 47, p. 53).    Mr. Maxwell asserts that he did not have a reasonable opportunity to respond to the motion to dismiss, and neither he nor the attorney who had filed a motion to appear on his behalf received notice of the order of dismissal.    (Doc. 47, p. 53).    According to Mr. Maxwell, the state trial court compounded the due process violation when the state trial court denied his motion to reconsider and refused his effort to amend his Rule 32 petition.    (Doc. 47, pp. 53–54).    Mr. Maxwell contends that he was deprived of the opportunity to remedy procedural defects in his *pro se* Rule 32 petition.    (Doc. 47, p. 54).

The state court record supports Mr. Maxwell's contentions concerning the cause for his procedural default.    Mr. Maxwell is correct; he did not have an automatic right to appointed counsel for his Rule 32 proceeding.    Rule 32.7(c) of the Alabama Rules of Criminal Procedure states:

> If the [trial] court does not summarily dismiss the petition, and if it appears that the petitioner is indigent or otherwise unable to obtain the assistance of counsel and desires the assistance of counsel, and it further appears that counsel is necessary to assert or protect the rights of the petitioner, the court shall appoint counsel.

88

Ala. R. Crim. P. 32.7(c).    Because he did not have a right to appointment of counsel,

Mr. Maxwell filed a *pro se* Rule 32 petition in the Circuit Court of Jefferson County;

he signed the petition on July 25, 2003.    (Doc. 40-16, pp. 6–22).    Under Rule 32.5

of the Alabama Rules of Criminal Procedure, Mr. Maxwell seems to have filed his

Rule 32 petition correctly in the Circuit Court of Jefferson County because that was

the court of conviction.    (Doc. 40, p. 2;_Doc. 40-1, pp. 31–35).[35]    The Clerk of the

Circuit Court of Jefferson County date-stamped Mr. Maxwell's motion on July 30,

2003, (Doc. 40-16, p. 6), and appears to have docketed the motion that day, (Doc.

40-17, p. 173).

In his *pro se* Rule 32 petition, Mr. Maxwell stated that because he was

confined to his cell 23 hours per day, he could not develop additional information to

support his petition.    (Doc. 40-16, p. 18).    He requested court-appointed counsel

to "protect both [his] state and federal rights," and he stated that in addition to the

grounds asserted in his *pro se* petition, he sought relief for "such other reasons as

may appear . . . upon further pleading."    (Doc. 40-16, pp. 18–21).    Mr. Maxwell

also filed a separate motion for appointment of counsel.    (Doc. 40-17, pp. 123–24).

---

[35] Rule 32.5 provides that Rule 32 petitions "shall be filed in and decided by the court in which the petitioner was convicted. If a petition is filed in another court, it shall be transferred to the court where the conviction occurred."    Ala. R. Crim. P. 32.5.

89

In that motion, Mr. Maxwell asserted that he was indigent and that his "rights [could] not be adequately protected without counsel" to assist him "in challenging [his] capital murder conviction and death sentence." (Doc. 40-17, p. 124). Mr. Maxwell filed with his *pro se* petition and motion for appointment of counsel a motion to proceed *in forma pauperis*. (Doc. 40-16, pp. 23–26). A judge granted the *IFP* motion on July 30, 2003, but did not rule on the other motions. (Doc. 40-16, p. 23).

Two weeks later, the State filed a motion in the Circuit Court of Jefferson County to toll the deadline for its response to Mr. Maxwell's *pro se* Rule 32 petition and asked the trial court to appoint an attorney to represent Mr. Maxwell. The State wrote: "Although there is no right to counsel in a Rule 32 proceeding, even one involving a death-penalty conviction, the State of Alabama supports the appointment of counsel for indigent capital inmates during these proceedings." (Doc. 40-17, p. 125). The State asserted that the "interests of justice and judicial economy [would] be served" if Mr. Maxwell was "provided with local counsel and given an additional 45 days from the appointment of such counsel to file a final Rule 32 petition" because doing so would prevent the State from having to file a second answer after Mr. Maxwell amended his petition with the assistance of counsel. (Doc. 40-17, p.

125).    The State reported that it would not object to an amended Rule 32 petition if appointed counsel filed the amendment within 45 days of his appointment.    (Doc. 40-17, p. 126).

Two weeks later, an attorney in the Federal Defender's Office in Montgomery, Alabama, Mr. Van Heest, filed a notice of appearance for Mr. Maxwell in the Circuit Court of Jefferson County and filed a motion to be appointed as Mr. Maxwell's attorney for purposes of Mr. Maxwell's Rule 32 proceeding. (Doc. 40-17, pp. 129–32; *see* Doc. 40-17, p. 95).    In his motion for appointment, Mr. Van Heest stated:    "This Court has not yet appointed undersigned counsel pursuant to Rule 32.7(c)."    (Doc. 40-17, p. 131).

As with the *Allen* charge record, the Court has had to attempt to fill gaps in the Rule 32 record to reconstruct what happened next in state court.    This much is certain – there was no action on Mr. Maxwell's motion for appointment of counsel, the State's request for appointment of counsel for Mr. Maxwell, or Mr. Van Heests's motion for appointment as Mr. Maxwell's Rule 32.7 attorney.    Recall that early in the trial proceedings, Mr. Maxwell's case was transferred from Colbert County to Jefferson County, but the judge from Colbert County remained with the case. Sometime during the proceedings in Mr. Maxwell's direct appeal, the Colbert

91

County judge left the state bench to join the federal bench.    It appears that a Jefferson County Circuit Court judge signed Mr. Maxwell's *IFP* motion in July 2003, but it is not clear whether that judge was assigned to the case or perhaps ruled on the motion as a duty judge.    The Rule 32 docket sheet does not shed light on the matter.[36]    The Rule 32 proceedings sat dormant in Jefferson County Circuit Court for 20 months, waiting for appointment of counsel for Mr. Maxwell for the case to proceed.    (Doc. 40-17, p. 173).

Sometime in early 2005, a new attorney in the Capital Division of the Alabama Attorney General's Office became responsible for Mr. Maxwell's Rule 32 proceeding.[37]    The new attorney filed in the Circuit Court of Colbert County a notice of appearance and a 34-page answer and motion to summarily dismiss Mr. Maxwell's Rule 32 petition.    (Doc. 40-16, pp. 27–68; Doc. 40-16, pp. 29–63).

---

[36] There is a manual docket sheet for Mr. Maxwell's Rule 32 proceedings that covers the time frame from July 2003 through sometime in 2005.    (Doc. 40-16, pp. 4–5; Doc. 40-17, pp. 173–74). There is an electronic docket sheet for Mr. Maxwell's Rule 32 proceeding that begins on April 20, 2005 and ends on May 31, 2005.    (Doc. 40-17, pp. 175–76).    Only the electronic docket sheet that begins on April 20, 2005 contains information about the judicial assignment.    As discussed below, that judicial assignment occurred in the Circuit Court of Colbert County.    (Doc. 40-17, pp. 175–76).

[37] In 2004, the Alabama Attorney General left office to join the federal bench, and the Governor of the State of Alabama appointed a new attorney to complete the former Attorney General's term. (*Compare* Doc. 40-17, p. 126, *with* Doc. 40-16, p. 62).

The certificates of service on the notice and motion bear the State's attorney's signature and the handwritten date April 19, 2005.    (Doc. 40-16, p. 65).    The State provided with its motion a 36-page proposed order from the Circuit Court of Colbert County granting the State's motion.    (Doc. 40-17, pp. 133–69).    The Court has not found in the record a motion to transfer Mr. Maxwell's Rule 32 proceeding from the Circuit Court of Jefferson County to the Circuit Court of Colbert County or an order transferring Mr. Maxwell's Rule 32 petition from the Circuit Court of Jefferson County to the Circuit Court of Colbert County.    The State appears to have acted unilaterally.    On April 20, 2005, a Colbert County judge was assigned to Mr. Maxwell's Rule 32 proceeding.    (Doc. 40-17, p. 175; Doc. 40-20, p. 101).[38]    The

---

[38] When Mr. Maxwell appealed from the denial of his Rule 32 petition and his motion to reconsider, the Alabama Court of Criminal Appeals remanded the case to the trial court to provide "a complete case action summary sheet or other document that sets out the procedural history of Maxwell's petition, including the date this cause was assigned to Judge Hatcher" because the Court of Criminal Appeals could not tell from the record "when the case was assigned to Judge Hatcher." (Doc. 40-20, p. 98).    In response, the Colbert County Circuit Court supplemented the record on appeal with an "on-line case action summary" that indicates that the case was assigned to Judge Hatcher on April 20, 2005.    (Doc. 40-17, p. 175).    The on-line case action summary indicates that as of April 20, 2005, Mr. Gardner was Mr. Maxwell's attorney.    (Doc. 40-17, p. 175).    That is not correct.

This was the second supplement to the record on appeal.    The first supplement added to the Rule 32 record on appeal three documents that Mr. Maxwell, the State, and Mr. Maxwell's first volunteer lawyer filed in Jefferson County:    Mr. Maxwell's motion for appointment of counsel, the State's motion to toll its time to answer Mr. Maxwell's Rule 32 petition and request for appointment of counsel for Mr. Maxwell, and Mr. Van Heest's motion for appointment as Mr. Maxwell's Rule 32 attorney.    (Doc. 40-17, pp. 118, 119–21, 123–24, 125–28, 131–32). Because these Jefferson County Circuit Court submissions were not part of the original record on

Court has found nothing in the record that suggests that Mr. Maxwell received notice that a new judge was assigned to his case on April 20, 2005.

On April 21, 2005, the Colbert County Circuit Court docketed the State's answer and motion to dismiss. (Doc. 40-16, p. 29; Doc. 40-17, p. 173). The State served its answer and motion to dismiss on Mr. Maxwell's yet-to-be-appointed attorney, Mr. Van Heest, by first-class mail. (Doc. 40-16, p. 65). The State did not serve its motion on Mr. Maxwell, even though he remained *pro se* because the trial court had not ruled on the parties' Rule 32.7 motions. It is not clear when Mr. Van Heest received the State's answer and motion to dismiss.

Six days after the Colbert County judge was assigned to Mr. Maxwell's Rule 32 proceeding and five days after the Colbert County Circuit Clerk docketed the State's motion to dismiss, the Circuit Court of Colbert County docketed a 36-page order granting the State's motion to summarily dismiss Mr. Maxwell's Rule 32 petition. (Doc. 40-17, p. 173; Doc. 40-20, pp. 61–97). It is the order that the State drafted, minus the word "proposed" on the first page of the order. (Doc. 40-17, pp. 133–69; Doc. 40-20, pp. 61–97). The order that the State prepared states that Mr. Maxwell's "plan[] [to] fil[e] an amended Rule 32 petition" tolled "the State's time

---

appeal, it appears that the documents may not have been before the Colbert County judge when she summarily dismissed Mr. Maxwell's *pro se* Rule 32 petition.

for filing an answer" to the petition and that, "[a]s of April 2005, Maxwell had still not submitted an amended Rule 32 petition."    (Doc. 40-20, p. 67, n. 2).    The order concludes that Mr. Maxwell's *pro se* Rule 32 petition "raise[d] no material issue of law or fact," and "that many of the claims [were] procedurally barred, fail[ed] to state a claim upon which relief may be granted, and/or [were] insufficiently pleaded."    (Doc. 40-20, p. 97).    Therefore, the newly-assigned Colbert County judge summarily dismissed Mr. Maxwell's *pro se* Rule 32 petition.    (Doc. 40-20, p. 97).

Oddly, a few weeks later, on May 17, 2005, the Colbert County Clerk's Office date-stamped a "Proposed Final Order" regarding Mr. Maxwell's Rule 32 petition. The language of the "Proposed Final Order" matches the language in the April 26, 2005 "Final Order."    (*Compare* Doc. 40-20, pp. 61–97, *with* Doc. 40-17, pp. 133–69).    The Colbert County judge appears to have signed the "Proposed Final Order" either on May 10, 2005 or on May 17, 2005; the handwritten date is unclear.    (Doc. 40-17, p. 169; *see* Doc. 40-17, pp. 99–100).    The "Proposed Final Order," though stamped as filed in the office of the circuit court clerk, (Doc. 40-17, p. 133), does

not appear on the docket sheet for Mr. Maxwell's Rule 32 case, (Doc. 40-17, pp. 173–74).[39]

A new attorney from the Federal Public Defender's Office in Montgomery, Alabama appeared for Mr. Maxwell on May 18, 2005, (Doc. 40-16, p. 103), and filed in the Circuit Court of Colbert County a motion to reconsider the trial court's summary dismissal of Mr. Maxwell's *pro se* Rule 32 petition, (Doc. 40-16, pp. 105–29).   In the motion to reconsider, Mr. Maxwell's new attorney stated that she had not received the trial court's April 26, 2005 dismissal order, so she prepared the motion to reconsider using the "State's Proposed Order."   (Doc. 40-16, p. 105). Mr. Maxwell's new attorney asked for an opportunity to respond to the State's motion to dismiss because Mr. Maxwell did not have sufficient time during the five-day window between the State's motion and the trial court's order to prepare and file a response.   (Doc. 40-16, p. 106).   On May 20, 2005, Mr. Maxwell's new attorney filed in the Colbert County Circuit Court a motion to amend Mr. Maxwell's

---

[39] This "Proposed Final Order" was added to the Rule 32 record on appeal through the first supplement to the record.   (Doc. 40-17, pp. 118, 133–69).

There is one more oddity – on the date stamp on the State's motion to dismiss Mr. Maxwell's *pro se* Rule 32 petition, the date, April 21, is handwritten over the stamp as "Apr 21."   (*Compare* Doc. 40-16, p. 29 (date stamp on State's motion to dismiss Mr. Maxwell's pro se Rule 32 petition), *with* Doc. 40-20, p. 61 (unmodified Apr 2005 clerk's office date stamp)).   The record does not provide an explanation for the handwritten revision of the Clerk's date stamp.

96

*pro se* Rule 32 petition and attached a proposed amended Rule 32 petition to the motion to amend.    (Doc. 40-16, pp. 131–33; Doc. 40-16, pp. 134–203, Doc. 40-17, pp. 3–80).    Mr. Maxwell's arguments concerning the effectiveness of his attorneys on direct appeal occupy three pages of the proposed amended petition.    (Doc. 40-17, pp. 71–73).

The State objected to Mr. Maxwell's motion for reconsideration and asked the Circuit Court of Colbert County to strike Mr. Maxwell's proposed amended petition. (Doc. 40-17, pp. 89–98).    The State posited that Mr. Maxwell's contention that he had not had a chance to amend his petition was "utterly without merit" because Mr. Maxwell "filed his pro se Rule 32 petition on July 30, 2003," an attorney filed an appearance for Mr. Maxwell in August 2003, and, as of April 2005, Mr. Maxwell "had still not submitted an amended Rule 32 petition."    (Doc. 40-17, p. 95).    The State argued that Mr. Maxwell "chose to sit on his hands and do nothing" and stated that "Maxwell was given the opportunity to amend his petition and he chose not to." (Doc. 40-17, p. 95).    The State acknowledged that it prepared the order that the Colbert County judge signed on April 26, 2005, (Doc. 40-17, p. 96), but the State did not acknowledge that it had asked the Circuit Court of Jefferson County, in the interests of judicial efficiency and justice, to appoint counsel for Mr. Maxwell and

had asked the Circuit Court of Jefferson County to allow Mr. Maxwell to amend his

petition <u>after</u> that circuit court entered an order appointing Rule 32.7 counsel so that

the State would have to respond only once to Mr. Maxwell's petition.    (Doc. 40-

17, pp. 125–26).

In a May 25, 2005 response to the State's motion to strike, Mr. Maxwell's

new attorney explained:

> To date, undersigned counsel has not received a copy of the Final
> Order. Because undersigned counsel's office did not receive a copy of
> the Final Order, counsel did not learn that this Court had dismissed Mr.
> Maxwell's Rule 32 Petition until approximately May 2, 2005, when
> counsel's office called the Assistant Attorney General, to ask if he
> opposed an additional brief time for filing an amended petition; he
> responded that the Petition had already been dismissed.

(Doc. 40-17, p. 99).    Mr. Maxwell's attorney pointed out that she was not receiving

from state court notification of the State's submissions, so she inferred the dates on

which the Circuit Court of Colbert County docketed the State's submissions.    (Doc.

40-17, p. 100, n. 1).[40]    Mr. Maxwell argued that he "fully intended to file an

amended petition" but "the court took no action" for 18 months.    (Doc. 40-17, p.

---

[40] Mr. Maxwell's attorney stated that the certificate of service on the State's response to Mr. Maxwell's motion to reconsider was dated May 19, so she inferred that the state trial court docketed the response on May 20.   (Doc. 40-17, p. 100, n. 1).   The state trial court docketed the State's response on May 24.   (Doc. 40-17, p. 173).

103).    The trial court denied Mr. Maxwell's motion to reconsider on May 25, 2005. (Doc. 40-17, pp. 106, 174).

On appeal from the dismissal of his Rule 32 petition, Mr. Maxwell argued that the trial court's summary dismissal of his Rule 32 petition without giving him an opportunity to respond to the State's motion to dismiss or amend his Rule 32 petition violated his right to due process.    In its opinion affirming the trial court's dismissal of Mr. Maxwell's Rule 32 petition, in rejecting Mr. Maxwell's due process argument, the Court of Criminal Appeals stated that "[a]fter approximately 20 months from his appointment," Mr. Maxwell's Rule 32 attorney "had not filed an amended petition."    (Doc. 40-20, p. 104).    The Court of Criminal Appeals added that "there is no due-process right on the part of a Rule 32 petitioner to file a response to a State's answer and/or motion to dismiss."    (Doc. 40-20, p. 105).

The Court of Criminal Appeals' conclusion rests on a flawed premise; the state trial court did not appoint an attorney to represent Mr. Maxwell in his Rule 32 proceedings.    A trial court judge did not rule on Mr. Maxwell's *pro se* motion, the State's motion, and Mr. Heest's motion to appoint Rule 32.7 counsel when the parties filed their motions in 2003, and the Colbert County judge assigned to the case on April 20, 2005 did not rule on the motions before she summarily dismissed Mr.

99

Maxwell's petition on April 25, 2005 in a 36-page order that the State prepared. The Court of Criminal Appeals did not recognize that the State had filed a motion to toll the time to answer Mr. Maxwell's *pro se* petition and had asked in the motion that Mr. Maxwell be permitted to amend his petition <u>after</u> the trial court appointed a Rule 32.7 attorney to represent Mr. Maxwell because the State did not want to have to respond to Mr. Maxwell's petition in a piecemeal fashion.    (Doc. 40-17, pp. 125–26) (stating that "requiring the State of Alabama to file an answer to a petition that will be amended upon the attainment of counsel will only postpone the need to file another answer in a short amount of time," that the "interests of justice and judicial economy will be served if Petitioner is provided with local counsel and given an addition[al] 45 days from the appointment of such counsel to file a final rule 32 petition," and that appointing counsel before having the State respond to Mr. Maxwell's *pro se* petition would "avoid the need to amend the petition" later in the Rule 32 proceedings).

Notably, neither the Circuit Court of Jefferson County nor the Circuit Court of Colbert County ruled on the State's motion to toll the time for filing its answer. Under Rule 32.7(a) of the Alabama Rules of Criminal Procedure, the State had to respond to Mr. Maxwell's *pro se* petition within 30 days unless the trial court

extended the State's deadline.   Ala. R. Crim. P. 32.7(a).[41]   The State did not

answer Mr. Maxwell's *pro se* petition within 30 days or at any point between August

2003 when the State filed its motion to toll and April 2005 when the State filed its

belated answer and motion for summary dismissal of Mr. Maxwell's *pro se* Rule 32

petition.   In the dismissal order that it proposed and that the trial court signed

without revision, the State wrote, without citation, that "the State's time for filing an

answer was tolled after Maxwell indicated that he planned on filing an amended

Rule 32 petition."   (Doc. 40-20, p. 67, n. 2).   Under Rule 32.7(a), only the trial

court had the authority to extend the State's deadline for answering Mr. Maxwell's

*pro se* petition; Mr. Maxwell's motion to appoint counsel did not toll the State's

deadline.   The State did not file an answer between August 2003 and April 2005

because, like Mr. Maxwell, the State was waiting for the Circuit Court of Jefferson

County to grant the parties' pending motions, appoint counsel, and set a deadline for

---

[41] Rule 32.7(a) provides:

> **Prosecutor's Response.** Within thirty (30) days after the service of the petition, or within the time otherwise specified by the court, the district attorney (or, in the case of a petition filed in the municipal court, the municipal prosecutor) shall file with the court and send to the petitioner or counsel for the petitioner, if any, a response, which may be supported by affidavits and a certified record or such portions thereof as are appropriate or material to the issues raised in the petition.

Ala. R. Crim. P. 32.7(a).   This language was in effect in 2003.

101

appointed counsel to amend Mr. Maxwell's *pro se* Rule 32 petition.   Because the trial court did not grant the State's 2003 motion to toll the deadline for its answer, the State's 2005 answer and motion to dismiss were untimely under Rule 32.7(a).

The Jefferson County and Colbert County proceedings regarding Mr. Maxwell's Rule 32 petition violate due process.   The phrase "due process" "expresses the requirement of 'fundamental fairness'" in a particular situation. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 24–25 (1981).   "The core of due process is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998).

Here, Mr. Maxwell filed his *pro se* Rule 32 petition in the court of conviction, the Circuit Court of Jefferson County, and the State asked the Circuit Court of Jefferson County to appoint an attorney to represent Mr. Maxwell.   The State asked the Circuit Court of Jefferson County to toll the State's deadline for answering Mr. Maxwell's *pro se* Rule 32 petition until a Rule 32.7 attorney amended Mr. Maxwell's petition.   The State stated that it sought appointed counsel for Mr. Maxwell as a matter of policy and represented that the State's interest in efficiency was served by having to respond after an attorney amended Mr. Maxwell's Rule 32 petition.   Then, 20 months later, without notice to Mr. Maxwell, the State moved

102

in the Circuit Court of Colbert County to summarily dismiss Mr. Maxwell's *pro se*

petition, and the State submitted to the Circuit Court of Colbert County a 36-page

draft dismissal order.    The State sought a ruling from the Circuit Court of Colbert

County without moving to transfer Mr. Maxwell's Rule 32 petition from the Circuit

Court of Jefferson County to the Circuit Court of Colbert County.    Mr. Maxwell

did not receive notice that the Circuit Court of Colbert County had summarily

dismissed the Rule 32 petition that he filed in the Circuit Court of Jefferson County.

"Gotchas" are not allowed in proceedings in capital cases.    *See Gardner v.*

*Florida*, 430 U.S. 349, 358, 362 (1977) (stating that a capital defendant "has a

legitimate interest in the character of the procedure which leads to the imposition of

[a] sentence" and concluding that the "petitioner was denied due process of law when

the death sentence was imposed, at least in part, on the basis of information which

he had no opportunity to deny or explain" where the trial judge imposed a death

sentence "on the basis of confidential information which is not disclosed to the

defendant or his counsel").    To be sure, under Rule 32.7, the trial court could have

summarily dismissed Mr. Maxwell's *pro se* petition without appointing an attorney

to represent him, but the Colbert County Circuit Court did not act on its own

initiative.    Instead, the Colbert County Circuit Court was prompted by the State's

103

motion to dismiss, and a Colbert County judge signed the dismissal order the State prepared five days after the judge was assigned to Mr. Maxwell's capital case.

Having joined in Mr. Maxwell's request for appointed counsel and asked the Jefferson County Circuit Court to allow Mr. Maxwell to amend his petition after counsel was appointed, it was fundamentally unfair for the State to then, without notice to Mr. Maxwell, move to dismiss his *pro se* petition in the Circuit Court of Colbert County and prepare a dismissal order for the Colbert County Circuit Court to sign without first moving to transfer Mr. Maxwell's Rule 32 proceeding from the Circuit Court of Jefferson County to the Circuit Court of Colbert County.[42]    It was fundamentally unfair for the State not to provide notice of its motion to dismiss directly to Mr. Maxwell when he was proceeding *pro se* because of the trial courts' inaction on the parties' motions to appoint counsel.  It was fundamentally unfair for the State to argue in the Circuit Court of Colbert County that Mr. Maxwell was dilatory in amending his petition when the State, in the interest of efficiency, had

_____

[42] The Court does not suggest that a new administration cannot revise the policies that the preceding administration followed, but when a defendant has relied on the policy of the initial administration, due process requires the new administration to give the defendant notice of the change in policy and an opportunity to protect his rights.  Here, if the State had advised Mr. Maxwell that it no longer agreed that the trial court should appoint a Rule 32.7 attorney to represent him in the Rule 32 proceedings, Mr. Maxwell could have amended his request for appointment of counsel to develop his reasons for his request for appointed counsel to assist him in the Rule 32 proceedings in his capital case.

asked the Circuit Court of Jefferson County to allow Mr. Maxwell to amend his petition <u>after</u> that court appointed a Rule 32.7 attorney to represent Mr. Maxwell. (Doc. 40-17, pp. 95, 125–26).   On this record, these state court proceedings violated Mr. Maxwell's right to due process.[43]

---

[43] As noted, Rule 32.5 states that Rule 32 petitions "shall be filed in and decided by the court in which the petitioner was convicted. If a petition is filed in another court, it shall be transferred to the court where the conviction occurred."  Ala. R. Crim. P. 32.5.  The State violated Rule 32.5 when it filed its motion to dismiss in the Circuit Court of Colbert County because Jefferson County Circuit Court was the court in which Mr. Maxwell was convicted.  When the Colbert County judged signed and issued the dismissal order that the State drafted, it appears that that court lacked jurisdiction to rule on Mr. Maxwell's Rule 32 petition.   In *Cayson v. State*, relying on Rule 32.5, the Alabama Court of Criminal Appeals stated:

> We are aware that a trial court's ruling on a petition for postconviction relief may be affirmed if it is "correct for any reason," *Swicegood v. State,* 646 So.2d 159, 160 (Ala.Crim.App.1994), and that the Alabama Supreme Court has held that " '[i]t is ridiculous to remand [an improperly labeled Rule 32 petition] so that the appellant will have the opportunity to file [the] petition in the proper form that will be promptly dismissed.' " *Ex parte Maddox,* 662 So.2d at 916 (quoting *Maddox v. State,* 662 So.2d 914, 915 (Ala.Crim.App.1993) (Bowen, J., dissenting)). However, in the instant case, the Escambia Circuit Court did not have jurisdiction to dispose of Cayson's Rule 32 petition because Escambia County is not the county of Cayson's conviction. This case must "be remanded for transfer to the court with the authority to make that determination." *Hiett,* 642 So.2d at 494 n. 3.

*Cayson v. State*, 778 So. 2d 261, 262 (Ala. Crim. App. 2000); *see also Sloan v. State*, 770 So. 2d 805 (Ala. Crim. App. 2000) (same); *Carter v. State,* 770 So. 2d 1112 (Ala. Crim. App. 2000) (same).   If the Circuit Court of Colbert County lacked jurisdiction to decide Mr. Maxwell's Rule 32 petition, then the Colbert County Circuit Court order denying his Rule 32 petition is void and cannot support an appeal.  *See Ex parte Butler*, 295 So. 3d 1115, 1117 (Ala. Crim. App. 2019).  The parties did not brief this issue, so the Court does not base its decision on this apparent flaw in Mr. Maxwell's Rule 32 proceedings.

105

Given the due process violation in this case, the Court is satisfied that "interference by officials" made Mr. Maxwell's effort to amend his Rule 32 petition to adequately plead his ineffective assistance of counsel claims impracticable such that those claims were not available for him to pursue in his appeal from the summary dismissal of his Rule 32 petition. *McCleskey*, 499 U.S. at 494. The Court finds that there is cause to excuse Mr. Maxwell's procedural default. Therefore, to proceed with his procedurally defaulted claims, Mr. Maxwell must demonstrate actual prejudice.

***

In Claim A.1.a of his habeas petition, Mr. Maxwell asserts that his trial attorneys were ineffective because they did not investigate and present mitigation evidence. (Doc. 8, pp. 37–54, ¶¶ 70–101). Similarly, Mr. Maxwell alleges in Claim A.11.b that his trial attorneys conducted an ineffective mitigation investigation. (Doc. 8, pp. 144–46, ¶¶ 224–26).

Mr. Maxwell's mitigation argument in his *pro se* Rule 32 petition occupies four paragraphs. (Doc. 40-16, pp. 13–15, ¶¶ 16–18, 21; Doc. 40-20, p. 118). The Alabama Court of Criminal Appeals based its analysis of Mr. Maxwell's ineffective assistance of trial counsel claims on the arguments he provided in his *pro se* petition.

106

In his *pro se* Rule 32 petition, Mr. Maxwell asserted that his trial attorneys' "decision not to pursue more than three mitigation witnesses, or . . . try to uncover other mitigation evidence" was deficient representation and was unreasonable. (Doc. 40-16, p. 13, ¶ 17). As mentioned, in the penalty phase of his trial, Mr. Maxwell's attorneys presented testimony from Dr. Crowder, a psychologist; Mr. Maxwell's mother; and his mother-in-law. (Doc. 40-16, p. 14, ¶ 17). In his *pro se* Rule 32 petition, Mr. Maxwell maintained that there were "many witnesses available to present a significant amount of mitigating evidence on [his] behalf." (Doc. 40-16, p. 14, ¶ 17). Mr. Maxwell stated that his trial attorneys "fail[ed] to investigate and present a plethora of evidence about [his] life and background that—had it been presented—would have constituted a basis for a sentence less than death." (Doc. 40-16, pp. 13–14, ¶ 17). Mr. Maxwell added that the mitigation testimony which trial counsel presented at the judicial sentencing hearing was deficient because only his mother testified and, due to lack of preparation, she did not know "what she should communicate through her testimony." (Doc. 40-16, p. 15, ¶ 21).

The Rule 32 dismissal order that the State prepared refers to Rules 32.6(b) and 32.7(d) and states that Mr. Maxwell did not provide sufficient facts to show prejudice with respect to his attorneys' failure to develop additional mitigation

evidence because he did not identify the information his trial attorneys would have developed had they done more.    (Doc. 40-20, pp. 87–88).    Additionally, Mr. Maxwell did not explain how additional mitigation evidence "would have changed the outcome."    (Doc. 40-20, p. 87).

The Alabama Court of Criminal Appeals affirmed the dismissal of these *Strickland* mitigation claims.    (Doc. 40-20, pp. 118–19).    The Court of Criminal Appeals determined that Mr. Maxwell's "allegations fail[ed] to provide a clear and specific statement of the grounds upon which relief is sought or a full disclosure of the factual basis of those grounds."    (Doc. 40-20, p. 118).    The Court of Criminal Appeals stated that Mr. Maxwell failed "to plead what mitigation evidence counsel would have discovered had [t]he[y] performed differently, how that mitigation would have aided counsel, whether that mitigation would have been admissible, and how counsel's alleged failure was prejudicial."    (Doc. 40-20, p. 118).

In his proposed amended Rule 32 petition, Mr. Maxwell listed some of the additional witnesses who his attorneys could have called in the penalty phase, (Doc. 40-17, p. 62), and he described some of the topics to which some of those witnesses could testify.    (Doc. 40-17, pp. 53–61).    Additionally, in his *pro se* petition and in his proposed amended Rule 32 petition, Mr. Maxwell faulted his trial attorneys for

108

presenting Dr. Crowder's "key" testimony about Mr. Maxwell's "life history and mental and emotional health" from a deposition transcript rather than calling Dr. Crowder as a live witness.    (Doc. 40-16, p. 14, ¶ 17; Doc. 40-17, pp. 62–63).

Having found cause for Mr. Maxwell's failure to present the more developed claims in his proposed amended Rule 32 petition to the Alabama Court of Criminal Appeals, the Court must evaluate whether Mr. Maxwell has demonstrated actual prejudice.    To do so, the Court must compare the evidence that Mr. Maxwell's attorneys presented in the penalty phase to the evidence that Mr. Maxwell described in his proposed amended petition to determine whether "there is a reasonable probability that at least one juror would have struck a different balance."    *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

At trial, Dr. Crowder provided Mr. Maxwell's most significant mitigation evidence.    Dr. Crowder performed a psychological evaluation of Mr. Maxwell. (Doc. 40-12, p. 162).    Mr. Maxwell was 26 years old when Dr. Crowder performed the evaluation.    (Doc. 40-12, p. 163).    Dr. Crowder interviewed and tested Mr. Maxwell, reviewed Mr. Maxwell's diary, and reviewed information about Mr. Maxwell's psychiatric treatment and counseling in Germany and in Georgia.    (Doc.

40-12, pp. 162–63).    Dr. Crowder interviewed Mr. Maxwell's mother and sister. (Doc. 40-12, p. 163).

Dr. Crowder reported that Mr. Maxwell came from "a relatively middle-class background." (Doc. 40-12, p. 164).    Mr. Maxwell's mother described him as independent and stated that "she had difficulty making him mind her."    (Doc. 40-12, p. 171).    When he was in elementary school, Mr. Maxwell's teachers called his mother and recommended a mental health evaluation.    (Doc. 40-12, p. 170).    Mr. Maxwell's teachers frequently sent him to school administrators to be disciplined. (Doc. 40-12, p. 169).    Other students called Mr. Maxwell names and picked on him. (Doc. 40-12, p. 169).    Mr. Maxwell's mother had Mr. Maxwell evaluated but she did not report that she scheduled other appointments after the initial evaluation. (Doc. 40-12, pp. 170–71).    Trips to the principal's office continued when Mr. Maxwell was in high school, and he frequently fought with other students.    (Doc. 40-12, p. 170).    Mr. Maxwell reported that he got in fights because he did not want other students to pick on him.    (Doc. 40-12, p. 170).

Mr. Maxwell's parents divorced before he was an adult and, after "a disagreement with his father," Mr. Maxwell "left the house" at age 17 and did not

110

return.   (Doc. 40-12, p. 164).   Mr. Maxwell "quit school in the eleventh grade because he got mad at a teacher."   (Doc. 40-12, p. 164).

After passing the GED test, Mr. Maxwell enrolled in a community college; he "wanted to be an architect."   (Doc. 40-12, p. 164).   Mr. Maxwell was a member of the National Guard and left school to train for Desert Storm.   (Doc. 40-12, p. 164).   The war ended before Mr. Maxwell completed his training.   (Doc. 40-12, p. 164).   Mr. Maxwell wanted to "but . . . didn't have money" to complete college. (Doc. 40-12, p. 165).   Mr. Maxwell requested financial help from his father to return to college, but he did not receive help.   (Doc. 40-12, p. 165).

Mr. Maxwell joined the army, became part of tanker training, and moved to Germany with his wife.   (Doc. 40-12, pp. 165–66).   Mr. Maxwell learned that his wife was having an affair with another soldier.   (Doc. 40-12, p. 166).   Because of financial and marital troubles, Mr. Maxwell cut his wrist.   Afterwards, Mr. Maxwell saw a mental health professional on the military base.   (Doc. 40-12, p. 166).   The army transferred Mr. Maxwell to Fort Stewart, Georgia, where his wife continued to have affairs.   The army eventually discharged Mr. Maxwell.   (Doc. 40-12, p. 167).   After his discharge, Mr. Maxwell had trouble maintaining

employment.    (Doc. 40-12, pp. 167–68).    He struggled to afford food and pay his rent, but he did not qualify for food stamps.    (Doc. 40-12, p. 168).

Mr. Maxwell reported no "substance abuse history."    (Doc. 40-12, p. 168). He scored an 85 on his IQ test which placed him in the 24th percentile range of individuals in his age group.    His score indicated low average intellectual functioning.    (Doc. 40-12, pp. 172–73).    Dr. Crowder did not detect signs of malingering.    (Doc. 40-12, p. 172).    Other testing showed that Mr. Maxwell was functioning at the sixth-grade level in reading and the fifth-grade level in math; Dr. Crowder described Mr. Maxwell's spelling as "atrocious" based on a review of Mr. Maxwell's diary.    (Doc. 40-12, p. 173).    Dr. Crowder opined that Mr. Maxwell had a learning disability and probably had had trouble "since first grade."    (Doc. 40-12, p. 173).

In evaluating Mr. Maxwell, Dr. Crowder administered personality tests. (Doc. 40-12, pp. 174–75).    Results from the Minnesota Multiphasic Personality Inventory indicated that Mr. Maxwell was "a rather disturbed individual" with a borderline personality disorder, which Dr. Crowder identified as a "chronic personality maladjustment."    (Doc. 40-12, pp. 176, 178).    Mr. Maxwell's "profile type" suggested "a history of a close relationship with a mother" and an "absent"

112

father.    (Doc. 40-12, p. 176).    Aligning with that category, Mr. Maxwell's mother reported that Mr. Maxwell's father "never really took interest in the kids."    (Doc. 40-12, p. 176).

According to Dr. Crowder, Mr. Maxwell's profile type has "a history of poor school adjustment with inner personal difficulties[,] . . . [v]ocational maladjustment," "severe marital discord," "extreme[] irritab[ility]," "hostility," "tension," "depression," and "difficulty in sleeping."    (Doc. 40-12, pp. 176–77). Dr. Crowder reported that these descriptions fit Mr. Maxwell. (Doc. 40-12, pp. 177–79).    Dr. Crowder stated that people with this personality type have a "tendency to blame others" and "complain about the behavior of others" without "complain[ing] about their own behaviors," despite similarities.    (Doc. 40-12, p. 177).    Dr. Crowder described Mr. Maxwell's borderline personality disorder as "a lifelong difficulty of inner personal relationships and adjustments in any aspect of life." (Doc. 40-12, pp. 178–79).

Mr. Maxwell scored a 32 on the Beck Depression Inventory.    (Doc. 40-12, p. 179).    According to Dr. Crowder, that score is considered severe depression but episodic.    This depression could lead to impulsive acts like Mr. Maxwell quitting school out of frustration with a teacher or cutting his wrists because of problems

113

with his wife.    (Doc. 40-12, p. 179).    Dr. Crowder stated that Mr. Maxwell's depression was "part and parcel of the borderline personality disorder."    (Doc. 40-12, p. 179).

Dr. Crowder testified that "personality disorders are ingrained maladaptive mechanisms of human interactivity which usually are very resistant to treatment" and that "borderline personality disorder is the most severe personality disturbance." (Doc. 40-12, p. 181).    Dr. Crowder testified that personality disorders could not be treated with medication, though related matters like depression could be treated with medication.    (Doc. 40-12, pp. 181–82).    Dr. Crowder added that he normally does not accept patients with borderline personality disorder because "their li[ves] [are] usually in such turmoil, and there are so many aspects of it, that you can't deal with all of it . . . on a one-hour-a-week basis."    (Doc. 40-12, p. 182).

Dr. Crowder stated that he would expect people with this disorder "to get worse" with time and to engage in criminal misconduct, suffer from alcoholism and drug addiction, and consider suicide.    (Doc. 40-12, p. 183).    According to Dr. Crowder, "a clinic or . . . hospital is much better suited to help those people than" an outpatient plan because of the "many, many, many crises that come up, some of them life threatening."    (Doc. 40-12, p. 184).    Dr. Crowder stated that individuals with

114

borderline personality disorder sometimes display temporary psychotic symptoms. (Doc. 40-12, p. 186).   Dr. Crowder testified that "there's not much available" for individuals with this personality disorder, especially without "financial help from insurance or some other way."   (Doc. 40-12, p. 183).

Ms. Whitehurst, Mr. Maxwell's mother, brought family photos to the penalty phase and testified about his childhood.   (Doc. 40-13, pp. 37–38).   Mr. Maxwell's father was not in the photo album.   (Doc. 40-13, p. 40).   According to Ms. Whitehurst, Mr. Maxwell's father "worked an awful lot but even the time that he was at home, he really wasn't home;" he was not there for Mr. Maxwell.   (Doc. 40-13, p. 40).   Ms. Whitehurst testified that Mr. Maxwell played football and baseball growing up and that she usually took him to his games.   (Doc. 40-13, p. 41).   Ms. Whitehurst stated that Mr. Maxwell's father "wasn't really interested in his [son's] activities."   (Doc. 40-13, p. 41).   Overall, Ms. Whitehurst believed that Mr. Maxwell's childhood was "pretty normal" other than "sort of a bad relationship" with his father.   (Doc. 40-13, p. 54).

Ms. Whitehurst testified about Mr. Maxwell's marriage and son, training for Desert Storm, and six years in the army.   (Doc. 40-13, pp. 43–45).   Through Ms. Whitehurst, Mr. Maxwell's attorneys introduced evidence of awards that Mr.

115

Maxwell received during his military service. (Doc. 40-13, p. 46). Ms. Whitehurst testified that Mr. Maxwell received a general discharge from the army "under honorable conditions." (Doc. 40-13, p. 46). On cross-examination, Ms. Whitehurst acknowledged that the discharge form reflected that "misconduct" was the reason for Mr. Maxwell's discharge, despite the "honorable" designation. (Doc. 40-13, p. 53). On cross-examination, Ms. Whitehurst also stated that she was not aware of traumatic events in Mr. Maxwell's childhood. (Doc. 40-13, p. 53).

In Mr. Maxwell's proposed amended Rule 32 petition, he contends that his father beat him and abused Ms. Whitehurst. (Doc. 40-17, pp. 55–56, 60). He states that his aunt saw the bruises from his father's beatings, (Doc. 40-17, p. 56), and his cousin could testify to his father's neglect, (Doc. 40-17, pp. 55–56). Mr. Maxwell asserts that one of his elementary school teachers could testify that Mr. Maxwell "had constant problems" and that Mr. Maxwell's father was "a strong disciplinarian" who regularly punished Mr. Maxwell. (Doc. 40-17, p. 58). This teacher recommended that Mr. Maxwell be evaluated at a mental health facility. (Doc. 40-17, p. 58). Mr. Maxwell quoted a letter from a school counselor who recommended that Mr. Maxwell "continue to see a counselor on a regular basis, and, if possible, be involved with group counseling with other troubled boys." (Doc.

116

40-17, pp. 59–60).    Mr. Maxwell mentions his wife's affairs while he was in the army, including her affair with his commanding officer.    (Doc. 40-17, p. 61).    He recounts that he received mental health counseling in the army after he slit his wrists, but he could not afford counseling after his discharge from the army.    (Doc. 40-17, p. 62).

Mr. Maxwell asserts that Dr. Crowder was not aware of most of these facts, causing Dr. Crowder to reach "improper and incomplete findings."    (Doc. 40-17, pp. 62–63).    Mr. Maxwell contends that if his trial attorneys had hired a competent expert, and provided the expert with all relevant evidence, the jury would have heard that Mr. Maxwell suffers from PTSD because of his childhood experiences.    (Doc. 40-17, p. 63).    Mr. Maxwell adds that a reasonable attorney who reviewed Dr. Crowder's deposition testimony would have hired another expert.    (Doc. 40-17, p. 64).

Mr. Maxwell has not explained why, when Dr. Crowder interviewed him, he (Mr. Maxwell), did not provide information about his father's beatings or the counseling he received in school.    Nothing in the record suggests that Dr. Crowder would not have considered this information if Mr. Maxwell or his mother had provided it during their interviews with Dr. Crowder.    (Doc. 40-12, pp. 162–63).

117

Mr. Maxwell has not explained how his attorneys' conduct in this regard was unreasonable. To support his claim regarding the insufficiency of mitigation evidence, Mr. Maxwell has not provided the opinions of another mental health professional whose opinions would shed light on the purported deficiencies in Dr. Crowder's opinions. And while Mr. Maxwell's attorneys may have concluded after Dr. Crowder's deposition that it was best not to call him as a live witness at trial, Mr. Maxwell has not explained how another expert would have fared in cross-examination, especially if Mr. Maxwell and his mother provided to a different expert the same information they provided to Dr. Crowder.

On this record, Mr. Maxwell has not overcome the presumption that his attorneys' decision to rely on Dr. Crowder's expert opinions and to present those opinions via deposition falls outside "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, or that he suffered actual prejudice because of his attorneys' mitigation strategy. Therefore, this *Strickland* claim fails.

\*\*\*

In claim A.2 of his habeas petition, Mr. Maxwell contends that his trial attorneys were ineffective because they did not object to the trial court's *sua sponte Allen* instruction. (Doc. 8, pp. 71–73, ¶¶ 126–28). Mr. Maxwell argues that in

118

failing to object, his trial attorneys did not comply with Rule 21.2 of the Alabama Rules of Criminal Procedure and permitted a flawed *Allen* charge that contained "damaging and factually erroneous" information regarding a retrial of the entire case and the expense associated with such a retrial.   (Doc. 8, pp. 71–72, ¶ 126).   Mr. Maxwell contends that this language coerced the jurors in the minority in the penalty phase to his detriment by pressuring them to abandon their beliefs and vote in the interest of "expediency and saving expenses."   (Doc. 8, p. 72, ¶ 127).   Mr. Maxwell argues that his attorneys did not attempt to make a record about the circumstances surrounding the *Allen* charge, including the fact that the jury had been deliberating for "only about an hour" and may not have been "truly deadlocked." (Doc. 8, p. 71, ¶ 126).   He argues that because his attorneys did not object to the *Allen* charge, the jury recommended the death penalty by a vote of 10 to 2.   (Doc. 8, p. 72, ¶ 126; *see* Doc. 40-16, p. 15, ¶ 20).

In his *pro se* Rule 32 petition, Mr. Maxwell argued that his trial attorneys were "grossly ineffective in the penalty phase of [his] trial in violation of [his] rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law."   (Doc. 40-16, p. 13, ¶ 16) (citing *Williams*, 529 U.S. at 362; *Strickland*, 466 U.S. at 686–87).   Mr.

Maxwell asserted generally that "[a]s a result of this ineffectiveness, the jury returned a recommendation of 10-2 for the death penalty, which the trial judge subsequently followed." (Doc. 40-16, p. 13, ¶ 16). With respect to the trial court's *Allen* charge, Mr. Maxwell argued that his trial attorneys were "ineffective for failing to object to the [trial] judge's 'dynamite' or 'Allen' charge to the jury when it returned from deliberations without reaching a sentencing recommendation." (Doc. 40-16, p. 15, ¶ 20). Mr. Maxwell continued:

> In instructing the deadlocked jury to resume deliberations and try to agree on a sentence, the judge told the jury that 'I know that you do not wish to put the State to the expense of another trial if it can be avoided.' My Counsel failed to object to this damaging and factually erroneous instruction, and less than fifteen minutes later, the jury returned a sentence recommendation of death by a vote of 10-2.

(Doc. 40-16, p. 15, ¶ 20) (citation omitted). Mr. Maxwell asked the trial court in his Rule 32 proceeding to appoint counsel to assist him in preserving his constitutional challenge to his conviction and sentence. (Doc. 40-16, p. 20, ¶ 33).

Relying on the order that the State prepared, the trial court summarily rejected Mr. Maxwell's ineffective assistance of trial counsel argument in his *pro se* Rule 32 petition because the Alabama Court of Criminal Appeals had rejected "[t]he underlying substantive claim" regarding the defects in the *Allen* charge on direct review. (Doc. 40-20, p. 91). Citing Rule 32.7(d), the trial court held that Mr.

120

Maxwell could not "prevail on a claim of ineffective assistance of counsel when the Court of Criminal Appeals ruled that the underlying ground for the claim was without merit." (Doc. 40-20, p. 91).

The Alabama Court of Criminal Appeals stated that because "the substantive claim [had] received only plain error review on direct appeal," Mr. Maxwell's ineffective assistance of counsel challenge regarding his attorneys' failure to object to the *Allen* charge could not be summarily rejected based on the Court of Criminal Appeals' plain error review of the charge. (Doc. 40-20, p. 128). The Court of Criminal Appeals held that this *pro se* ineffective assistance of trial counsel claim was subject to "summary disposition" because Mr. Maxwell did not plead the ground for Rule 32 relief sufficiently per the requirements of Rules 32.6(b) and 32.7(d) of the Alabama Rules of Criminal Procedure. (Doc. 40-20, p. 128). The Court of Criminal Appeals stated that Mr. Maxwell's Rule 32 petition "omit[ted] specific details regarding how the charge was coercive and threatening and how it improperly urged the jury to reach a guilty verdict, or how it was coercive when considered in the context of the whole case" and failed to show "how the outcome of trial would

121

have been different had his trial counsel performed differently regarding this claim."

(Doc. 40-20, pp. 128–29).[44]

Effectively then, the Court of Criminal Appeals concluded that Mr. Maxwell did not adequately describe in his *pro se* Rule 32 petition how his attorneys' failure to object to the *sua sponte Allen* charge prejudiced him.    Mr. Maxwell's proposed amended petition contains more developed arguments concerning the ineffectiveness of Mr. Maxwell's trial attorneys because of their failure to object to the *Allen* charge.    (Doc. 40-17, pp. 31–33).

In his proposed amended Rule 32 petition, Mr. Maxwell explains why he contends that the *sua sponte Allen* charge was flawed.    (Doc. 40-17, pp. 31–33). The Court has explained why it concludes that the *Allen* charge was improperly coercive, but that does not resolve the *Strickland* issue concerning Mr. Maxwell's attorneys' failure to object to the charge.    Mr. Maxwell has not overcome the presumption that his attorneys' failure to object to the charge "falls within the wide range of reasonable professional assistance."    *Strickland*, 466 U.S. at 689.    In

---

[44] There seems to be some confusion in the Court of Criminal Appeals' decision because the Court of Criminal Appeals questioned how the *Allen* charge "improperly urged the jury to reach a guilty verdict." (Doc. 40-20, pp. 128–29).    As discussed, the *Allen* charge appears in the penalty phase of Mr. Maxwell's case, not in the guilt phase.    The Alabama Court of Criminal Appeals should have considered how the outcome of the penalty phase would have been different if Mr. Maxwell's attorneys had objected to the *Allen* charge.

122

hindsight, it is easy to say that Mr. Maxwell's attorneys should have objected to the fact that the trial court did not consult with counsel before giving the *sua sponte* charge and should have objected to a one-sided, legally inaccurate charge and to the giving of an *Allen* charge in the first instance, but this Court must "evaluate the conduct from counsel's perspective at the time" of representation.    466 U.S. at 689.

Because the jury had deliberated for fewer than two hours when jurors somehow notified the trial court that they could not reach a verdict, the trial court had the discretion to give an *Allen* charge.    *Lowenfield*, 484 U.S. at 238 (stating that where jurors had deliberated for one hour "on the first ballot, the court would incontestably have had the authority to insist that they deliberate further"). Therefore, lawyers might hold different strategic views about objecting to any *Allen* charge.    As to the substance of the charge, as the Supreme Court recognized in *Lowenfield*, the potential for improper coercion in an *Allen* charge, a charge that by its very nature is designed at some level to coerce a verdict, may not be apparent to a lawyer "on the spot."    *Lowenfield*, 484 U.S. at 240.    This is particularly true for lawyers who do not have the opportunity to review the charge before a judge delivers the charge to the jury.    Under the circumstances of this case, the Court does not find that Mr. Maxwell's trial attorneys' failure to object to the *sua sponte Allen* charge

123

meets *Strickland*'s rigorous standard for objectively reasonable performance. Therefore, Mr. Maxwell is not entitled to relief on this claim.

***

In Claim A.3, Mr. Maxwell asserts that trial counsel should have objected when "the Sheriff's Department placed him in handcuffs and shackles" during a lunch recess in the penalty phase.   (Doc. 8, p. 73, ¶ 129).   In his *pro se* Rule 32 petition, Mr. Maxwell alleged that "[w]hile the jury was recessed for lunch on the day of the penalty phase . . . , the Sheriff's Department placed [him] in handcuffs and shackles."   (Doc. 40-16, p. 15, ¶ 22).   According to Mr. Maxwell, trial counsel "did not object to such physical restraints despite the prejudicial effect they could have [had] on the jury."   (Doc. 40-16, p. 15, ¶ 22).   Mr. Maxwell added that trial counsel "deferred to the Sheriff's Department's policy," and Mr. Maxwell asserted that jurors saw him in handcuffs and shackles when they entered the courtroom after lunch.   (Doc. 40-16, p. 15, ¶ 22).

The final order that the trial court entered states that that Mr. Maxwell pleaded this claim deficiently, so the trial court dismissed the claim based on Rules 32.6(b) and 32.7(d).   (Doc. 40-20, pp. 126–27).   The Alabama Court of Criminal Appeals concluded that the summary dismissal was proper because Mr. Maxwell had failed

124

to state a *Strickland* claim.    (Doc. 40-20, pp. 126–27).    The Court of Criminal Appeals noted that Mr. Maxwell "ha[d] not shown how . . . trial counsel's conduct was deficient or how the outcome of his trial would have been different had . . . trial counsel performed differently regarding this claim."    (Doc. 40-20, pp. 126–27).

In his proposed amended Rule 32 petition, Mr. Maxwell has not explained what trial counsel should have done differently to address the sheriff's department's policy.    The penalty phase transcript indicates that before the jurors returned to the courtroom from their lunch break, the trial court let the attorneys know that a sheriff's deputy would be "putting handcuffs and shackles on Mr. Maxwell."    (Doc. 40-13, p. 69).    The deputy had told the trial court that the sheriff's department "ha[d] a policy" to restrain a defendant who was convicted of capital murder.    (Doc. 40-13, p. 69).    One of the prosecutors stated that he was not concerned if jurors could not see the restraints and suggested only leg restraints.    (Doc. 40-13, p. 69). Mr. Gardner suggested seating Mr. Maxwell in the courtroom before the jurors returned.    (Doc. 40-13, p. 70).    The trial court agreed and reminded everyone to "sit down because [Mr. Maxwell was] sitting down."    (Doc. 40-13, p. 70).    After that, the jury returned to the courtroom.    (Doc. 40-13, p. 70).

125

Because the transcript shows that Mr. Maxwell's attorney, the prosecutor, and the trial court took steps to ensure that the jury was not aware that Mr. Maxwell was restrained in the courtroom, Mr. Maxwell cannot demonstrate that his attorney's conduct was objectively unreasonable.    Consequently, Mr. Maxwell is not entitled to habeas relief on this *Strickland* claim.[45]

***

Mr. Maxwell asserts in Claim A.5.h that trial counsel should have challenged a biased juror for cause.    (Doc. 8, p. 94, ¶ 157).    In his *pro se* Rule 32 petition, Mr. Maxwell alleged that trial "counsel's performance was wrought with other deficiencies and errors that rendered [their] assistance ineffective and served to prejudice [his] defense."    (Doc. 40-16, p. 12, ¶ 15).    According to Mr. Maxwell, "[t]hese mistakes 'so undermined the proper functioning of the adversarial process' that the outcome of [his] trial was rendered unreliable. *Strickland*, 466 U.S. at 686."    (Doc. 40-16, p. 12, ¶ 15).    There deficiencies and errors include trial counsel's

---

[45] Mr. Maxwell cites *Deck v. Missouri*, 544 U.S. 622 (2005).    There, the Supreme Court held that "the Constitution forbids the use of visible shackles during the penalty phase . . . unless that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial."    544 U.S. at 624 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)). The Supreme Court decided *Deck* after the Alabama Court of Civil Appeals issued its decision in Mr. Maxwell's direct appeal, so *Deck* is not clearly established precedent under AEDPA.    And, as discussed, Mr. Maxwell's restraints were not visible to the jury in the penalty phase, so *Deck* does not help Mr. Maxwell.

"failure to strike potential jurors whose answers during voir dire cast[ed] doubt on their ability to be impartial." (Doc. 40-16, p. 12, ¶ 15).

The Rule 32 final order rejects these allegations because Mr. Maxwell did not "identify the potential jurors" who trial counsel should have struck or explain "why [those jurors] could not have been impartial." (Doc. 40-20, p. 81). The Alabama Court of Criminal Appeals affirmed the summary dismissal, stating that Mr. Maxwell's "allegation [wa]s vague and provided the State and the trial court with no precise information about the [claim]." (Doc. 40-20, p. 123). The Court of Criminal Appeals held that Mr. Maxwell "did not satisfy the burden of pleading under Rule[s] 32.3 and . . . 32.6(b)" because even if his allegations were true, "a circuit court could not determine whether" relief was appropriate. (Doc. 40-20, p. 123).

In his proposed amended Rule 32 petition, Mr. Maxwell alleges that trial counsel should have challenged Juror V.B. for cause because she had connections to Colbert County. (Doc. 40-16, pp. 160-62). Juror V.B.'s parents lived in Colbert County, and she was dating a man who worked for the Sheriff's department in Colbert County. (Doc. 40-16, p. 161). Juror V.B. stated that she might know one of the State's witnesses, Dana Hester. (Doc. 40-16, p. 161).

127

With respect to Mr. Hester, Juror V.B. stated during voir dire that she had heard the name and that "he probably was in school when [she] was in school," but he was "a lot younger." (Doc. 40-9, p. 194). Juror V.B. stated "I wouldn't know him if he was here." (Doc. 40-9, p. 194). Juror V.B. stated that she had last lived in Colbert County 15 years earlier, that her parents and her brother still lived there, and that she had heard of the murders, but she did not know anyone involved. (Doc. 40-9, pp. 90-91). When asked if there was anything about her family relationships or the fact that she was from Colbert County that "would in any way interfere with [her] ability to be fair and impartial," Juror V.B. replied "No." (Doc. 40-9, p. 92).

With respect to the individual who Juror V.B. had dated, it is not clear that he worked for the Colbert County Sheriff's Department. During voir dire, Mr. Maxwell's attorney asked the members of the venire if they knew anyone in the Colbert County DA's office. (Doc. 40-9, p. 172). He next asked about the DA's office in Jefferson County. (Doc. 40-9, p. 172). Mr. Maxell's attorney then asked about the Sheriff's Department without specifying a particular county. (Doc. 40-9, p. 173). Juror V.B. responded that she had dated T.W., a sheriff's deputy, but she was not seeing him at the time of jury selection. (Doc. 40-9, p. 175). Juror V.B. could not describe T.W.'s work, and she stated that T.W. did not discuss his

128

work with her.   (Doc. 40-9, pp. 175–76).   The totality of the questions and responses concerning deputy sheriffs and other law enforcement officers indicates that Mr. Maxwell's attorney was trying to determine whether members of the venire had relationships with law enforcement officers that would impact the decisions they would have to make in Mr. Maxwell's trial.   (Doc. 40-9, pp. 175–84).   Many members of the venire provided information about law enforcement officials from several cities and counties.

On this record, Mr. Maxwell's attorney's failure to challenge Juror V.B. for cause was not objectively unreasonable.   Therefore, Mr. Maxwell is not entitled to habeas relief on this *Strickland* claim.

***

Mr. Maxwell maintains in Claim A.6.b that his trial attorneys should have requested funds to retain a ballistics or firearms expert.   (Doc. 8, p. 98, ¶¶ 163–64). In his *pro se* Rule 32 petition, Mr. Maxwell alleged that "trial counsel failed to procure the necessary expert . . . assistance to effectively challenge the State's theory of guilt."   (Doc. 40-16, p. 11, ¶ 12).   Mr. Maxwell stated that trial counsel should have retained "a firearm and projectile expert to challenge . . . the State's firearm expert," whose testimony was "devastating to [the] defense and provided the

129

strongest circumstantial evidence of . . . guilt." (Doc. 40-16, p. 11, ¶ 12). Mr. Maxwell asserted that a firearms expert could have testified about "a glaring ambiguity in the testimony of the State's . . . expert, who [stated] that two of the bullets recovered from the victims d[id] not conclusively match any of the guns recovered from [Mr. Moore's] home." (Doc. 40-16, p. 11, ¶ 12).

The Colbert County Circuit Court's final order dismisses this claim for insufficient pleading, noting that Mr. Maxwell did not name a firearms expert, summarize that expert's anticipated testimony, or explain how the absence of such an expert was prejudicial to his defense. (Doc. 40-20, p. 77). The Alabama Court of Criminal Appeals analyzed this claim under the umbrella of "expert and investigative assistance" and affirmed the circuit court's summary dismissal. (Doc. 40-20, pp. 109–10, 113–14). The Court of Criminal Appeals stated that Mr. Maxwell's allegations were "merely the assertions of conclusions" instead of "a clear and specific statement of the grounds" supporting relief, (Doc. 40-20, p. 113), and held that Mr. Maxwell's *pro se* allegations did not satisfy Rules 32.3 and 32.6(b), (Doc. 40-20, p. 114).

This claim does not provide a basis for relief because Mr. Maxwell has not explained in his *pro se* Rule 32 petition or in his proposed amended petition how

testimony from a ballistics expert would have changed the jury's decision to convict him of capital murder given his statement to police about his direct involvement in the Pughs' murders.   Because Mr. Maxwell has not demonstrated prejudice resulting from the absence of a ballistics expert, this *Strickland* claim does not provide a basis for habeas relief.   *Compare Hinton v. Alabama*, 571 U.S. 263, 276 (2014) (stating that if there was "a reasonable probability that Hinton's attorney would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt had the attorney known that the statutory funding limit had been lifted, then Hinton was prejudiced.").   Mr. Maxwell's Claim A.9.a concerning his trial attorneys' failure to cross-examine Mr. Wheeler, the State's ballistics expert, fails for the same reason.   (Doc. 8, pp. 137–38, ¶ 211).

***

Relatedly, Mr. Maxwell alleges in Claim A.7.a. that *Strickland* relief is appropriate because his trial attorneys did not request funds for an investigator. (Doc. 8, p. 8, ¶ 174).   Mr. Maxwell raised the issue in his *pro se* Rule 32 petition. (Doc. 40-16, pp. 11, 13, ¶¶ 12, 17).   With respect to the State's guilt-phase case, Mr. Maxwell maintained that an investigator would have assisted trial counsel in identifying eyewitnesses and exculpatory evidence.   (Doc. 40-16, p. 11, ¶ 12).

131

Mr. Maxwell argued also that an investigator would have provided penalty-phase assistance in locating "a plethora of mitigating evidence about [his] life and background" which would have provided a basis for a sentence other than death. (Doc. 40-16, p. 13, ¶ 17).

The Colbert County Circuit Court's final order rejects this claim for lack of specificity about "what an investigator would have uncovered that would have been beneficial to [Mr. Maxwell's] defense;" the circuit court denied the claim under Rules 32.6(b) and 32.7(d).    (Doc. 40-20, p. 78).    The Alabama Court of Criminal Appeals concluded that Mr. Maxwell had not satisfied the pleading requirements of Rules 32.3 and 32.6(b) and affirmed the summary dismissal of this claim.    (Doc. 40-20, p. 113).    The Court of Criminal Appeals stated that whether "as presented in the petition" or stated in his brief, Mr. Maxwell had not "provided a clear and specific statement of the grounds" supporting relief.    (Doc. 40-20, p. 113).

As with Mr. Maxwell's argument regarding the lack of a ballistics expert, Mr. Maxwell has not demonstrated prejudice with respect to his attorneys' failure to hire an investigator because he has not demonstrated how eyewitnesses would change the outcome of the guilt-phase of his trial, given his confession.    The mitigation analysis below applies here and addresses why Mr. Maxwell has not

132

demonstrated prejudice with respect to additional mitigation evidence that an investigator may have located.   Therefore, this *Strickland* claim does not provide a basis for habeas relief.

***

In Claim A.9.c, Mr. Maxwell asserts that trial counsel were ineffective because they failed to cross-examine FBI agent Herbert Smith adequately.   (Doc. 8, p. 139 ¶ 214).   Mr. Smith helped with the investigation into the robbery and murders and was the lead law enforcement officer in Mr. Maxwell's interrogation and recorded statement.    (Doc. 8, p. 139 ¶ 214).

In his *pro se* Rule 32 petition, Mr. Maxwell alleged that trial counsel "failed to adequately cross-examine the State's main law enforcement witness, Herbert Smith."   (Doc. 40-16, p. 11, ¶ 11).   According to Mr. Maxwell, his attorneys should have asked questions about the "investigation of possible suspects, including [Mr. Maxwell], and the tactics [Mr. Smith] used to elicit a statement from [Mr. Maxwell]."   (Doc. 40-16, p. 11, ¶ 11).

The Colbert County Circuit Court order dismissed this cross-examination claim based on Rules 32.6(b) and 32.7(d), (Doc. 40-20, pp. 75–76), because Mr. Maxwell did "not state what questions his counsel should have asked Mr. Smith" or

133

"how he was prejudiced by counsel's alleged failures." (Doc. 40-20, p. 76). The Alabama Court of Criminal Appeals agreed that Mr. Maxwell's cross-examination allegations concerning Mr. Smith were not adequate. (Doc. 40-20, pp. 109–10, 113–15, 117–18).

Mr. Maxwell has not alleged facts to overcome the presumption that his trial attorneys acted reasonably in cross-examining Agent Smith. Mr. Maxwell's attorney asked Agent Smith whether Mr. Maxwell "was pretty straightforward in admitting . . . his guilt," and Agent Smith responded, "Yes, sir." (Doc. 40-12, p. 54). Mr. Maxwell's attorney discussed with Agent Smith some of Mr. Maxwell's references to Mr. Moore in the recorded statement and asked whether Agent Smith thought that Mr. Maxwell's fear of Mr. Moore was an exaggeration; Agent Smith responded, "No, sir." (Doc. 40-12, pp. 55). Thus, Mr. Maxwell's attorneys reasonably focused their cross-examination of Agent Smith on questions that would support their arguments for a sentence of life imprisonment in the penalty phase. For example, in closing argument in the penalty phase, Mr. Maxwell's attorney cited Agent Smith's testimony and argued that Mr. Maxwell feared for his life "if he did not go through with" Mr. Moore's plan he (Mr. Maxwell) "would get a bullet in the head" from Mr. Moore. (Doc. 40-12, p. 82).

Thus, rather than attempt to undermine Mr. Maxwell's confession, a confession that Mr. Maxwell's attorneys tried unsuccessfully to exclude from evidence, Mr. Maxwell's attorneys used the circumstances surrounding the confession to attempt to persuade jurors that the death penalty was not appropriate in Mr. Maxwell's case. Though the lawyers' strategy proved unsuccessful, Mr. Maxwell has not demonstrated that his trial attorneys conduct fell below "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, this *Strickland* claim fails.

***

Mr. Maxwell maintains in Claim A.12.a. that trial counsel should have objected when Mr. Sennett testified in the guilt phase that he knew the Pughs "[t]hrough [little league] baseball and . . . church." (Doc. 8, pp. 146–47, ¶¶ 227–28; Doc. 40-10, p. 60). Mr. Maxwell asserts that the testimony was irrelevant to his guilt and improper. (Doc. 8, p. 146, ¶ 227).

The Colbert County Circuit Court final order relies on the Alabama Court of Criminal Appeals' rejection of a direct-review challenge of the same testimony by one of Mr. Maxwell's co-defendants, Mr. Ferguson. (Doc. 40-16, p. 10, ¶ 9; Doc. 40-20, p. 77). The Court of Criminal Appeals held in Mr. Ferguson's case "that

135

the testimony was properly introduced to establish the witness's relationship and knowledge of the victims." (Doc. 40-16, p. 77). The circuit court order states that "any objection by Maxwell's attorneys would also have been meritless." (Doc. 40-16, p. 78). Additionally, the circuit court order states that Mr. Maxwell did not "demonstrate prejudice" because "the testimony was properly introduced." (Doc. 40-16, p. 78). The circuit court order dismisses the claim under Rule 32.7(d)'s lack of materiality clause. (Doc. 40-16, p. 78). The Alabama Court of Criminal Appeals affirmed, finding that Mr. Maxwell had "failed to raise a material issue of law or fact that would entitle [him] to relief." (Doc. 40-20, p. 119).

This *Strickland* claim fails because Mr. Maxwell has not demonstrated how an objection and a motion to strike Mr. Sennett's testimony would have changed the result in his criminal case. Therefore, Mr. Maxwell is not entitled to habeas relief on this claim.

***

Mr. Maxwell asserts in Claim A.14.e that trial counsel should have objected when the prosecutor argued that he (Mr. Maxwell) "knew for days, probably weeks, that it was gonna be necessary to kill somebody." (Doc. 8, p. 152, ¶ 236) (internal

136

quotation marks omitted); (Doc. 40-13, p. 84).    Mr. Maxwell presented this argument in his *pro se* Rule 32 petition.    (Doc. 40-16, p. 12, ¶ 14).

The Colbert County Circuit Court order relies on Mr. Maxwell's recorded statement in which Mr. Maxwell indicated that he "had been told prior to the murders to kill anyone who saw his face."    (Doc. 40-20 pp. 79–80).    Citing Rule 32.7(d), the order states that the prosecutor's comment "was a proper inference" based on Mr. Maxwell's statement.    (Doc. 40-20, p. 80).    The Alabama Court of Criminal Appeals affirmed agreed.    (Doc. 40-20, p. 122).    The Court of Criminal Appeals stated that because "[c]ounsel cannot be . . . ineffective for not filing a motion for which there is no legal basis," Mr. Maxwell could not establish deficient performance," so his *Strickland* claim was "without merit."    (Doc. 40-20, p. 122).

Mr. Maxwell does not mention the claim in his brief.    (Doc. 47).    Mr. Maxwell has not demonstrated that his attorneys' failure to object falls below "the wide range of reasonable professional assistance."    *Strickland*, 466 U.S. at 689. His attorneys reasonably may have believed that an objection would draw more attention to the argument and would harm Mr. Maxwell.    Mr. Maxwell is not entitled to habeas relief on this *Strickland* claim.

***

137

In Claim A.14.k, Mr. Maxwell raises another prosecutorial comment which he contends trial counsel should have challenged as improper. (Doc. 8, pp. 154–56, ¶ 242). In his *pro se* Rule 32 petition, Mr. Maxwell asserted that his attorneys should have objected to the prosecutor's remark in both phases of his trial that jurors should "apply [their] good God-given common sense." (Doc. 40-16, p. 12, ¶ 14) (internal quotation marks omitted); (Doc. 40-12, p. 76) (State's guilt-phase closing argument); (Doc. 40-13, p. 85) (State's penalty-phase closing argument).

The Colbert County Circuit Court final order states that, in the context of "the entire record at trial," the language was not "an attempt to sway the jury by means of religious references." (Doc. 40-20, p. 79). Citing Rule 32.7(d), the order dismisses the claim because "nothing was improper or prejudicial" in the prosecutor's use of the phrase. (Doc. 40-20, p. 79). The Alabama Court of Criminal Appeals agreed that the prosecutor's remark was "a plea for a common[-]sense evaluation" to the jury. (Doc. 40-20, p. 121). The Court of Criminal Appeals noted that "[j]urors are often asked to use their common sense in reaching verdicts," so trial counsel's "failure to object was not deficient performance." (Doc. 40-20, p. 121).

138

In his habeas petition, Mr. Maxwell cites *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), in support of this claim.    In *Romine*, the Eleventh Circuit reversed a habeas judgment denying sentencing relief based on the prosecutor's use of "Biblical authority during closing argument."    253 F.3d at 1354, 1371.    In *Romine*, "[r]eligion permeated virtually every aspect of the resentencing trial." 253 F.3d at 1358.    The prosecutor in that case gave a "rousing call for the jury to sentence Romine to death, after prayer if need be, because the Bible required that result."    *Romine*, 253 F.3d at 1360.    The remark at issue here is very different from the language that caused the Eleventh Circuit to reverse the habeas decision in *Romine*.    *Romine* does not help Mr. Maxwell demonstrate that the Alabama Court of Criminal Appeals improperly applied Supreme Court precedent in its decision affirming the dismissal of this *Strickland* claim.

Mr. Maxwell is not entitled to habeas relief on this claim because he has not established that it was unreasonable for his attorneys not to object to the prosecutor's remarks, and he has not established that an objection would have changed the verdict in his criminal trial.

***

139

Mr. Maxwell contends in Claim A.17.a that trial counsel failed to request a penalty-phase jury instruction on the weight to give to victim-impact testimony. (Doc. 8, pp. 163–65, ¶¶ 256–59).    Mr. Maxwell raised the issue in his *pro se* Rule 32 petition.    (Doc. 40-16, pp. 14–15, ¶ 19).    He alleged that "the State called two witnesses—Joey Pugh's fifth-grade teacher and Harold Pugh's lifelong friend—to testify regarding the impact the victims' deaths . . . had on the community."    (Doc. 40-16, p. 14, ¶ 19).

Relying on the Alabama Court of Criminal Appeals' rejection of this *Strickland* claim in Mr. Maxwell's direct appeal, the Colbert County Circuit Court order dismissed this claim under Rule 32.7(d).    (Doc. 40-20, pp. 89–90).    The Alabama Court of Criminal Appeals affirmed for a different reason.    (Doc. 40-20, pp. 123–25).    The Court of Criminal Appeals determined that Mr. Maxwell did not plead the claim sufficiently.    (Doc. 40-20, pp. 124–25).    The Court of Criminal Appeals added that the instructions the trial court gave in the penalty phase of Mr. Maxwell's trial "clearly sufficed to prevent the jury's affording disproportionate weight to the victim-impact testimony."    (Doc. 40-20, p. 125).    The instructions included the admonition that jurors should not be influenced by "passion, prejudice, or any other arbitrary factors."    (Doc. 40-20, p. 125; *see* Doc. 40-13, pp. 113–14).

140

Mr. Maxwell has not identified an additional instruction that would have changed the outcome of the penalty phase of his criminal trial. Therefore, he is not entitled to habeas relief on this *Strickland* claim.

***

Many of Mr. Maxwell's remaining ineffective assistance of trial counsel claims are unexhausted and procedurally defaulted because Mr. Maxwell did not present them on collateral appeal. (*See* Doc. 41, pp. 33–36; Doc. 40-17, pp. 3–78; Doc. 14-16, pp. 12–13). Those claims include:

Claim A.1.b—trial counsel were ineffective for presenting Dr. Crowder's testimony in the penalty phase, (Doc. 8, pp. 55–71, ¶¶ 102–25);

Claim A.4—trial counsel had a conflict of interest in this group of ineffective assistance claims, (Doc. 8, pp. 75–77, ¶¶ 132–34);

Claim A.5.a—trial counsel failed to adequately argue a motion for a juror questionnaire, (Doc. 8, pp. 79–80, ¶¶ 138–40);

Claim A.5.b—trial counsel failed to request individual voir dire, (Doc. 8, pp. 80–81, ¶ 141);

Claim A.5.c—trial counsel failed to adequately conduct group voir dire, (Doc. 8, pp. 81–84, ¶¶ 142–45);

141

Claim A.5.d.—trial counsel failed to rehabilitate venire members who were opposed to the death penalty or object when the trial court did not ask additional questions, (Doc. 8, pp. 85–89, ¶¶ 146–49);

Claim A.5.e—trial counsel permitted voir dire to begin before Mr. Maxwell was in the courtroom, (Doc. 8, pp. 89–92, ¶¶ 150–52);

Claim A.5.f—trial counsel minimized the jury's sense of responsibility for deciding whether Mr. Maxwell should live or die, (Doc. 8, pp. 92–93, ¶¶ 153–55);

Claim A.5.g—trial counsel asked voir dire questions that implied death was the appropriate verdict, (Doc. 8, p. 94, ¶ 156);

Claim A.6.a—trial counsel failed to request funds for a jury psychologist or other jury-selection expert, (Doc. 8, pp. 97–98, ¶ 162);

Claim A.6.c—trial counsel failed to request funds for a neurologist, (Doc. 8, p. 99, ¶ 165);

Claim A.6.d—trial counsel failed to request funds for a mental health expert, (Doc. 8, pp. 99–100, ¶ 166);

Claim A.6.e—trial counsel failed to request funds for an expert child psychologist, (Doc. 8, p. 100, ¶ 167);

Claim A.6.f—trial counsel failed to request funds for a clinical social worker, (Doc. 8, pp. 100–01, ¶ 168);

Claim A.6.g—trial counsel failed to request funds for a footprint expert, (Doc. 8, pp. 101–02, ¶ 169);

Claim A.6.h—trial counsel failed to request funds for a forensic expert, (Doc. 8, p. 102, ¶ 170);

Claim A.6.i—trial counsel failed to request funds for a forensic pathologist, (Doc. 8, pp. 102–03, ¶ 171);

Claim A.7.b—trial counsel failed to investigate the State's witnesses for bias or prejudice, (Doc. 8, p. 105, ¶ 175);

Claim A.7.c—trial counsel failed to investigate adequately witnesses who were arrested and charged in the case, (Doc. 8, p. 105, ¶ 175);

Claim A.7.d—trial counsel failed to adequately investigate Mr. Maxwell's co-defendants, (Doc. 8, p. 105, ¶ 175);

Claims A.7.e and A.8.a—trial counsel failed to adequately investigate Mr. Moore's role in the crime (Doc. 8, pp. 105–29, ¶¶ 176, 178–93);

Claim A.8.b—trial counsel failed to move the court to order the State to preserve and retain the physical evidence, (Doc. 8, pp. 129–32, ¶¶ 194–200);

143

Claim A.8.c—trial counsel failed to show that the State's firearms expert did not find identifiable latent fingerprints on one of the cartridges, (Doc. 8, p. 132, ¶ 201);

Claim A.8.d—trial counsel failed to investigate the possibility that Harold Pugh's ex-wife was connected to the crime, (Doc. 8, pp. 132–34, ¶ 202);

Claim A.8.e—trial counsel failed to investigate the possible involvement of other suspects in the crime, (Doc. 8, p. 134, ¶ 203);

Claim A.8.f—trial counsel failed to investigate the possibility that the two people who another witness reported seeing were involved in the crime, (Doc. 8, p. 135, ¶ 204);

Claim A.8.g—trial counsel failed to conduct an independent examination of the physical evidence, (Doc. 8, pp. 135–36, ¶¶ 205–07);

Claim A.9.c—trial counsel failed to cross-examine several guilt-phase witnesses, (Doc. 8, pp. 137–39, ¶¶ 209, 211–13);

Claim A.11.a—trial counsel failed to request funds for a mitigation investigator, (Doc. 8, pp. 143–46, ¶¶ 222–26);

Claim A.12.b—trial counsel failed to object to the testimony of Frank Brians, (Doc. 8, pp. 146–47, ¶¶ 227–28);

144

Claim A.13—trial counsel failed to adequately object to cumulative and inflammatory photographs, (Doc. 8, pp. 148–49, ¶¶ 229–30);

Claim A.14.a—trial counsel failed to object when the prosecutor argued that Mr. Moore had virtually no role in the crime, (Doc. 8, pp. 149–51, ¶¶ 232–33);

Claim A.14.b—trial counsel failed to object when the prosecutor told the jury not to have "false compassion or sympathy" for Mr. Maxwell, (Doc. 8, p. 151, ¶ 234);

Claim A.14.c—trial counsel failed to object when the prosecutor said Mr. Maxwell gave orders to his co-defendants, (Doc. 8, p. 151, ¶ 234);

Claim A.14.d—trial counsel failed to object when the prosecutor argued that Mr. Maxwell's actions were intentional because he hesitated before pulling the trigger, (Doc. 8, pp. 151–52, ¶ 235);

Claim A.14.f—trial counsel failed to object when the prosecutor mischaracterized penalty-phase evidence, (Doc. 8, pp. 152–53, ¶ 237);

Claim A.14.g—trial counsel failed to object when the prosecutor told the jury to ignore testimony about mental illness, (Doc. 8, p. 153, ¶ 238);

Claim A.14.h—trial counsel failed to object when the prosecutor stated his opinion, (Doc. 8, pp. 153–54, ¶ 239);

145

Claim A.14.i—trial counsel failed to object when the prosecutor relied on facts that were not in evidence, (Doc. 8, p. 154, ¶ 240);

Claim A.14.j—trial counsel failed to object when the prosecutor misrepresented the law, (Doc. 8, p. 154, ¶ 241);

Claim A.15—trial counsel failed to object when the trial court had Mr. Maxwell meet with them in the courtroom, (Doc. 8, pp. 156–58, ¶¶ 244–47);

Claim A.16—trial counsel failed to object to the trial court's instruction on reasonable doubt, (Doc. 8, pp. 158–63, ¶¶ 248–55);

Claim A.17.b—trial counsel failed to move the trial court to instruct the jurors that they must return a verdict of life without parole if the aggravating and mitigating circumstances are equal in weight, (Doc. 8, pp. 166–73, ¶¶ 260–70);

Claim A.18—trial counsel failed to litigate adequately the motion to suppress Mr. Maxwell's statement, (Doc. 8, pp. 173–76, ¶¶ 271–76); and

Claim A.19—trial counsel failed to move to suppress Mr. Maxwell's statement on the ground that the interrogation continued after he invoked his right to counsel, (Doc. 8, pp. 176–83, ¶¶ 277–84).

These claims were part of Mr. Maxwell's proposed amended Rule 32 petition. Mr. Maxwell raised many of these claims in his *pro se* Rule 32 petition, and he

146

sought relief in the Court of Criminal Appeals on his *pro se* arguments.    (Doc. 40-18, pp. 5–7, 71–73).    He did not present the more developed factual allegations and arguments from his proposed amended Rule 32 petition to the Court of Criminal Appeals.    (Doc. 40-18, pp. 5–7, 71–73, 81–89).    Consequently, the Alabama Court of Criminal Appeals did not have an opportunity to consider the substance of Mr. Maxwell's amended Rule 32 claims.    (Doc. 40-20, pp. 99, 104–05).

Because the Court has concluded that the State violated Mr. Maxwell's due process rights with respect to his Rule 32 proceedings, the Court finds cause to excuse Mr. Maxwell's failure to include the ineffective assistance of trial counsel arguments in his amended Rule 32 petition to the Alabama Court of Criminal Appeals; however, those claims fail under the *Strickland* standard because Mr. Maxwell has not demonstrated that his trial attorneys "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment."    466 U.S. at 687.

The errors that Mr. Maxwell describes in these claims fall squarely within a trial attorney's discretion.    Given the evidence presented in the guilt phase of Mr. Maxwell's trial, including his confession to the burglary and the murders, the alleged attorney errors in the guilt phase of Mr. Maxwell's trial, if remedied, would not

147

change the verdict; the verdict in the guilt phase "is reliable."    466 U.S. at 687. The verdict in the penalty phase is less reliable, given the jurors' deadlock and the two jurors who maintained their votes for life imprisonment, but Mr. Maxwell's criticisms of his attorneys' performance in the penalty phase do not rise to the level of objectively unreasonable behavior.    Therefore, under *Strickland*, Mr. Maxwell is not entitled to relief on the ineffective assistance of trial counsel claims in his amended Rule 32 petition.

Other habeas claims that Mr. Maxwell did not exhaust fully are:

Claim A.10.a—trial counsel's opening statement and closing argument in the guilt phase were inadequate, (Doc. 8, pp. 140–41, 143, ¶¶ 215–18, 221; Doc. 41, p. 60);

Claim A.10.b—trial counsel's opening statement and closing argument in the penalty phase were inadequate, (Doc. 8, pp. 142–43, ¶¶ 219–21; Doc. 41, p. 62);

Claim A.20—the cumulative effect of trial counsel's guilt- and penalty-phase errors prejudiced Mr. Maxwell, (Doc. 8, p. 183, ¶ 20); and

Claim A introduction—trial counsel's inadequate compensation contributed to their ineffective assistance, (Doc. 8, pp. 35–36, ¶¶ 68–69).

Claims A.10.a and A.10.b were part of Mr. Maxwell's *pro se* Rule 32 petition, (Doc. 8, pp. 140–43, ¶¶ 215–21; Doc. 40-16, pp. 12–14, ¶¶ 15, 18), but Mr. Maxwell did not include either argument in his brief to the Alabama Court of Criminal Appeals, (Doc. 40-18, pp. 5–7, 71–73), and he did not discuss them in his petition to the Alabama Supreme Court for certiorari review.    (Doc. 40-19, pp. 74, 88–96). In his cert petition to the Alabama Supreme Court, Mr. Maxwell did not pursue Claim A.20 or his argument regarding inadequate compensation that appears in Claim A's introduction to the Alabama Supreme Court.    (*Compare* Doc. 40-20, pp. 108–09, *with* Doc. 40-19, pp. 89–96; *compare* Doc. 40-18, pp. 2, 73–75, *with* Doc. 40-19, pp. 73, 89–96).    Consequently, to pursue these unexhausted claims, Mr. Maxwell must show cause and prejudice.    Mr. Maxwell has not attempted to carry his burden in his brief.    (Doc. 47).    Therefore, the unexhausted claims in this group do not provide a basis for relief.

***

In Claim B, Mr. Maxwell states that his trial attorneys continued to represent him in his appeal from his conviction and death sentence, and he argues that his attorneys "failed to raise numerous meritorious issues," causing him to suffer prejudice.    (Doc. 8, pp. 184–86, ¶¶ 286–89).    Focusing on the trial court's *Allen*

149

charge, Mr. Maxwell points out that his attorneys' appellate argument regarding constitutional flaws in the *Allen* charge was fewer than two pages.   Mr. Maxwell contends that there was "much law" that his attorneys should have presented to support his argument that the trial court's *Allen* charge coerced the jury into recommending the death penalty. (Doc. 8, p. 185, ¶ 288).   Mr. Maxwell asserts: "Given the importance of this issue, appellate counsel's anemic argument was constitutionally insufficient, especially considering that Mr. Maxwell received the minimum number of votes required for the jury to recommend a life sentence." (Doc. 8, p. 185, ¶ 288).

The record demonstrates that in his *pro se* Rule 32 petition, Mr. Maxwell did not raise the ineffectiveness of his lawyers on direct appeal.   (Doc. 40-16, pp. 6–21).   Nevertheless, because the Court has found that there is cause to excuse Mr. Maxwell's procedural default, Mr. Maxwell may proceed on his ineffective assistance of counsel claims if he has demonstrated actual prejudice.

Mr. Maxwell has not carried that burden.   As noted, Mr. Maxwell's arguments concerning the effectiveness of his attorneys on direct appeal occupy three pages of the proposed amended petition.   (Doc. 40-17, pp. 71–73).   Though Mr. Maxwell points to several ways in which he contends that his brief on direct

appeal was inadequate, he does not provide arguments that he could have presented in his appellate brief to change the result in his direct appeal. He argues, for example, that there is "much law supporting the argument" that the trial court's *Allen* charge coerced the jury's penalty phase verdict, (Doc. 40-17, pp. 72–73), but Mr. Maxwell did not cite cases in his proposed amended Rule 32 petition to substantiate his assertion or explain how the cases that his attorneys should have cited would have caused the Alabama Court of Criminal Appeals to conclude that the trial court's *Allen* charge was unconstitutionally coercive.

Because Mr. Maxwell has not established that he will suffer actual prejudice if this federal court declines to hear his ineffective assistance of appellate counsel arguments, Mr. Maxwell has not overcome procedural default on that claim.

<u>Request for an Evidentiary Hearing and Discovery</u>

Mr. Maxwell requests an evidentiary hearing and discovery. (Doc. 8, p. 189). Because Mr. Maxwell has not established an entitlement to habeas relief based on his allegations of constitutional error in his capital conviction and sentence, the Court will not hold an evidentiary hearing or allow discovery. *See Cullen*, 563 U.S. at 182, 184 ("[l]imiting § 2254(d)(1) review to the state-court record" and

precluding consideration of "evidence later introduced in federal court [a]s irrelevant" to the habeas analysis).

## Conclusion

For the reasons discussed in this opinion, Mr. Maxwell has not established a basis for habeas relief. Therefore, by separate order, the Court will deny and dismiss with prejudice Mr. Maxwell's amended petition for a writ of habeas corpus.

Because the petition does not present issues that are debatable among jurists of reason, this Court will not issue a certificate of appealability. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000); Rule 11(a), Rules Governing § 2254 Proceedings. If Mr. Maxwell wishes to appeal, he must request a certificate of appealability from the Eleventh Circuit Court of Appeals. Rule 11(a), Rules Governing § 2254 Proceedings; Fed. R. App. P. 22. For additional information about the time to file a notice of appeal, see Rule 11(b), Rules Governing § 2254 Proceedings and Fed. R. App. P. 4(a).

**DONE** and **ORDERED** this May 28, 2026.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

152